IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| GARY T. WINNETT, FREDA | ) | |
| JACKSON-CHITTUM, CASPER R. | ) | |
| HARRIS, WILLIAM H. DAILEY, | ) | |
| CALVIN E. GROGAN, KENNETH C. | ) | |
| HAMMER, and CHARLES A. | ) | |
| WATERFIELD, on behalf of themselves | ) | |
| and others similarly situated, | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 3:06-cv-00235 |
| | ) | District Judge Trauger |
| v. | ) | Magistrate Judge Brown |
| | ) | |
| CATERPILLAR, INC., | ) | Class Action |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM**

Currently pending before the court is a motion to dismiss by the defendant (Docket No. 74), the plaintiffs' response thereto (Docket No. 80), and the defendant's reply to that response (Docket No. 90). For the reasons explained herein, the defendant's motion will be DENIED.

I.    Introduction

This is an action for retiree health insurance benefits brought by eight former employees of the defendant Caterpillar, Inc. ("Caterpillar") and one surviving spouse. On March 28, 2006, Plaintiffs Winnett, Jackson-Chittum, and Harris filed this action in this court. Caterpillar then filed a motion to transfer the case to the Central District of Illinois, which the court denied by order entered June 20, 2006. On September 5, 2006, the plaintiffs filed a First Amended Complaint in which they added named Plaintiffs Dailey, Hammer, Grogan, and Waterfield. On

1

September 5, 2006, the court consolidated this case with *Finn v. Caterpillar Inc.*, Civil No. 3:06-0802.[1]  The plaintiffs seek relief under § 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185, and under § 502 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132, from the defendant Caterpillar for breach of a collective bargaining agreement ("CBA") and a welfare benefit plan.   The plaintiffs are retired hourly wage employees of the defendant, or their surviving spouses.

The defendant provided health care benefits for the plaintiffs pursuant to successive CBAs with the United Auto Workers ("UAW").  According to the plaintiffs, their rights to these benefits vested because they or their spouses worked for decades under the contracts, and these rights were repeated in ERISA-mandated Summary Plan Descriptions[2] ("SPDs") promulgated by Caterpillar.   The plaintiffs claim that the defendant breached its promise to pay lifetime retiree health benefits at no cost when, in 2004, without the retirees' consent, Caterpillar began charging retirees and their surviving spouses for a portion of their medical care.  The plaintiffs also complain they were charged increased co-payments for prescription drugs and other out-of-pocket expenses.

The plaintiffs seek an order declaring that they are vested in lifetime medical benefits under the 1998 labor contracts at no cost to themselves, an injunction requiring Caterpillar to

[1]A related case, *Kerns v. Caterpillar, Inc.*, 3:06-cv-0113, is also pending before this court. The *Kerns* case has not been consolidated with the instant case.

[2]A summary plan description is a publication explaining the benefits of a particular welfare benefit plan.  ERISA requires employers to distribute the descriptions to employees.  29 U.S.C. § 1022.

2

maintain retiree medical benefits at December 2005 levels, compensatory and punitive damages, attorneys' fees, and costs. The plaintiffs also seek to represent a putative class of retirees and surviving spouses under Federal Rule of Civil Procedure 23 (1) who are or were participants or beneficiaries in Caterpillar's plan that provided for retiree medical insurance benefits; (2) for whom the UAW had been the employees' collective bargaining representative at the time of their retirement from Caterpillar, Inc.; and (3) who began working for Caterpillar prior to the expiration of the 1988 labor agreement and who retired on or after January 1, 1992, and before March 16, 1998, and became eligible for the immediate commencement of a monthly pension (with at least five years of credited service) under the Non-Contributory Pension Plan upon retirement; and, in the case of beneficiaries of such retirees, who is a surviving participant spouse whose employee spouse fulfilled the conditions above leaving a spouse with a survivor pension. (Am. Comp. ¶ 35, Docket No. 61; Docket No. 103). The plaintiffs also move to certify three subclasses, whose circumstances allegedly give rise to additional grounds. (*Id.*)

On September 25, 2006, Caterpillar filed a motion to dismiss (Docket No. 74), contending that the court lacks subject matter jurisdiction over this suit. Alternatively, the defendant contends that the Amended Complaint fails to state claims upon which relief can be granted and/or the claims asserted have been time-barred for years.[3] Therefore, Caterpillar concludes, this case should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(1) or dismissed with prejudice under Rule 12(b)(6). In response, the plaintiffs assert that the court has

---

[3]In a one-sentence footnote, the defendant also contends that the plaintiffs' surviving spouses' claims are moot. (Docket No. 75 at 20 n.3). This issue is addressed in more detail by both parties in connection with the plaintiffs' pending motion for class certification. The court therefore will address the issue of mootness in a forthcoming order and memorandum resolving the certification motion.

subject matter jurisdiction over this suit; the plaintiffs' rights and the rights of the proposed class members vested under the 1988 CLA and previous contracts; retirees were not required to allege breach of the duty of fair representation against UAW; the action is timely brought, under either the applicable six- or ten-year statute of limitation; and the allegations based on the SPDs state a claim. (Docket No. 80).

II.    Facts

The facts are taken from the parties' briefs filed in connection with Caterpillar's motion to dismiss as well as those briefs submitted in connection with the plaintiffs' motion for class certification, the evidence submitted in support of those briefs, and the Amended Complaint. Where facts are disputed, the court so notes.

A.    *The Caterpillar-UAW Collective Bargaining Relationship*

The Caterpillar-UAW bargaining relationship began with the UAW's 1948 certification as the union for Caterpillar employees in East Peoria, Illinois. *(*Aff. of David W. Stevens, ¶ 8, Docket No. 76). Over time, Caterpillar's UAW bargaining relationship expanded to include employees at multiple facilities, primarily in Illinois. *(Id.,* ¶¶ 9-10). Eventually, Caterpillar and the UAW agreed to engage in multi-plant bargaining for most Caterpillar UAW-represented employees. (*Id.* ¶ 9). This came to be known as "Central Bargaining," and the resulting labor contracts included a Central Labor Agreement ("CLA"), and related local agreements and benefits agreements. *(Id.)*

B.    *Pre-1988 CLAs and SPDs*

The plaintiffs began working under CLA's negotiated with Caterpillar by the UAW as early as plaintiff Grogan's employment on October 4, 1951. Retiree medical benefits were not set forth

4

in the CLA's themselves, but in a separate Insurance Plan Agreement ("IPA") and an attached

Group Insurance Plan ("GIP"). Retiree benefits were also described in the SPD's. (1979 IPA, Ex

1. to Declaration of Michael Mulder, Docket No. 105).

Caterpillar began offering no-cost retiree medical benefits as early as 1970 in that year's

SPD, which stated:

> Medical Benefits After Retirement
>
> If you retire and are eligible for the immediate receipt of a pension
> under the Non-Contributory Pension Plan, you will be eligible for the
> Retired Medical Benefit Plan, continued at no cost.

(1970 SPD at 19, Ex. 2 to Decl. of Mulder, Docket No. 105.) The same plan also provides that:

"For the surviving spouse of a retired employee, coverage will be continued for his or her lifetime

at no cost." *(Id.)* The same promises in the same or similar language were repeated in agreements

including:

> • The "1979 Benefit Plans and Agreements, UAW and Local 974
> Insurance Program, Retirement Plan and Supplemental
> Unemployment Benefit Plan." (1979 IPA) (Ex. 1);[4]

---

[4]The 1979 IPA provides:

> Retired Employees who satisfy the requirements hereinafter
> set forth shall be entitled to the same benefits provided in this Section
> V as if they were Employees. Coverage in accordance with this
> paragraph 5.15 shall be provided without cost to any such retired
> Employee. Such benefits to the extent provided in this paragraph
> 5.15 will be provided after his retirement from active service for a
> retired employee is [sic] he HAS AT LEAST 5 YEARS OF
> CREDITED SERVICE UNDER THE NON-CONTRIBUTORY
> PENSION PLAN AT HIS RETIREMENT AND is eligible for such
> immediate commencement of a monthly pension under the Non-
> Contributory Pension Plan or would be eligible for such immediate
> commencement but for his election to defer commencement of his
> pension. Coverage shall take effect on his retirement date . . .
>
> . . . Dependents' Coverage shall be in effect in accordance with this

5

> • The 1983 "Benefit Plans for Caterpillar employees represented by
> the United Auto Workers" (1983 SPD) (Ex. 3);[5] and
> • The 1986 "Benefit Plans for Caterpillar employees represented by
> the United Auto Workers" (1986 SPD) (Ex. 4).[6]

The 1979 IPA contained language expressly stating that "Termination of this Agreement shall not

have the effect of automatically terminating the Plan." (1979 IPA at 14, Docket No. 105, Ex. 1 to

Decl. of Michael Mulder).

_____

> paragraph 5.15 while Personal Coverage is in effect with respect to
> (a) all Dependents of a retired Employee who were covered
> hereunder on the day preceding his retirement and (b) any person
> who becomes a Dependent after the retirement of a retired Employee
> if such retired Employee either was covered for Dependents'
> Coverage prior to retirement, or had no Dependents prior to
> retirement and such Dependents' Coverage will be continued
> following the death of a retired Employee for the remainder of his
> surviving spouse's life without cost . . . .

(Ex. 1 to Decl. of Michael Mulder, Docket No. 105)(emphasis in original).

[5]The 1983 SPD provides: "If you retire and are eligible for the immediate receipt of a
pension (with at least 5 years of credited service) under the Non-Contributory Pension Plan, you will
be eligible for the Retired Medical Benefit Plan, continued at no cost." (Ex. 3 to Decl. of Michael
Mulder, Docket No. 105).

[6]The 1986 SPD provides:

> Medical Benefits After Retirement.
> If you retire and are eligible for the immediate receipt of a pension (with at least
> 5 years of credited service) under the Non-Contributory Pension Plan, you will be
> eligible for the Retired Medical Benefit Plan, continued at no cost. The Plan will
> not duplicate benefits under Medicare. A leaflet describing the Retired Medical
> Benefit Plan is available at the plant Employee Benefits Office."
> * * *
> Conversion Privilege.
> If an active employee dies when eligible to retire or if a retired employee dies, the
> surviving spouse will have coverage continued for his or her lifetime at no cost.
>
> Subject to applicable CBAs, the company reserves the right to terminate the
> employee benefit Plans. A Plan termination may result in the denial or loss of
> benefits that a participant or beneficiary might otherwise expect to receive.

(Ex. 3 to Decl. of Michael Mulder, Docket No. 105).

C.    *The 1988-91 Insurance Benefits*

    1.    *The 1988 IPA and GIP*

The 1988 CLA, like the preceding CLA's, did not contain any language substantively providing or incorporating by reference any health insurance benefits, including retiree health care. (Aff. of David W. Stevens, ¶ 12). Rather, such benefits were set forth in the 1988 IPA between Caterpillar and the UAW, along with the appended 1988 GIP. *(Id.,* ¶ 12, Exs. 1-2.)

The 1988 IPA was effective by its terms until October 1, 1991. *(Id.,* ¶ 12, Ex. 1, § 9.) Pursuant to Section 2 of the 1988 IPA, Caterpillar agreed to "continue to maintain for eligible Employees the Group Insurance Plan which was in effect on the day preceding the date…" of the 1988 IPA, subject to the amendments outlined in the 1988 IPA. *(Id.,* ¶ 12, Ex. 1, § 2.) The 1988 IPA further provided that the "provisions of the Group Insurance Plan as in effect on September 30, 1988, shall continue in effect until amended pursuant to the foregoing and thereafter to the extent not amended pursuant to the foregoing." *(Id.,* ¶ 12, Ex. 1, § 3.) It further provided: "Termination of this Agreement shall not have the effect of automatically terminating the Plan." *(Id.,* Ex. 1, § 9.)

Section 2.1 of the 1988 GIP provided that Caterpillar would "maintain the Plan herein described…" and would "pay such part of the cost thereof as is not provided by Employee contributions…." *(Id.,* ¶ 12, Ex. 2, § 2.1). Section 5 of the 1988 GIP set forth provisions regarding active and retiree health care. *(Id.,* ¶ 12, Ex. 2, § 5.) As is relevant to this case, paragraph 5.1 provided that:

> A benefit shall be provided in accordance with this Section only
> for an Employee, while coverage for such benefit is in effect with
> respect to him, or a Dependent of an Employee, while Dependents'
> Coverage for such benefit is in effect with respect to such
> Employee. Benefits in accordance with this Section will be
> provided by his Employer without cost to the Employee except as

7

otherwise provided in paragraph 6.1(a) *[Termination of Coverage]*….

*(Id.,* ¶ 12, Ex. 2, § 5.1.).

        With respect to retirees and surviving spouses, Section 5.15 of the 1988 GIP provided:

> Retired Employees who satisfy the requirements hereinafter set forth shall be entitled to the same benefits provided in this Section V as if they were Employees. Coverage in accordance with this paragraph 5.15 shall be provided without cost to any such retired Employee. Such benefits to the extent provided in this paragraph 5.15 will be provided after his retirement from active service for a retired Employee if he has at least 5 years of credited service under the Non-Contributory Pension Plan at his retirement and is eligible for the immediate commencement of a monthly pension under the Non-Contributory Pension Plan or would be eligible for such immediate commencement but for his election to defer commencement of his pension. Coverage shall take effect on his retirement date…
>
> * * *
>
> Dependents' Coverage shall be in effect in accordance with this paragraph 5.15 while Personal Coverage is in effect with respect to (a) all Dependents of a retired Employee who were covered hereunder on the day preceding his retirement and (b) any person who becomes a Dependent after the retirement of a retired Employee if such retired Employee either was covered for Dependents' Coverage prior to retirement or had no Dependents prior to retirement, and such Dependents' Coverage will be continued following the death of a retired Employee for the remainder of his surviving spouse's life without cost. For purposes of this paragraph 5.15 only, the terms "Employee" and "Employee's", wherever appearing in other sections hereof, shall be deemed to read "retired Employee" and "retired Employee's", respectively.

*(Id.,* ¶ 12, Ex. 2, ¶ 5.15.)

        2.      *The 1988 SPD*

8

In addition to the above documents, UAW-represented employees were provided with a SPD (the "1988 SPD"). *(Id., ¶ 13, Ex. 3.)* According to Caterpillar, as active employees during the term of the 1988 labor contracts, all of the named plaintiffs or their Caterpillar spouses would have received the 1988 SPD. *(Id., ¶ 13.)* With respect to retiree medical benefits, the 1988 SPD advised active employees:

> If you retire and are eligible for the immediate receipt of a pension (with at least 5 years of credited service) under the Non-Contributory Pension Plan, you will be eligible for the Retired Medical Benefit Plan, continued at no cost to you.

*(Id., ¶ 13, Ex. 3, p. 38.)* With respect to surviving spouse health insurance, the 1988 SPD stated:

> If an active employee dies when eligible to retire or if a retired employee dies, the surviving spouse will have coverage for his or her lifetime at no cost to the survivor.

*(Id., ¶ 13, Ex. 3, p. 36.)*

Finally, the 1988 SPD contained the following "Plan Termination Provisions":

> Subject to the applicable collective bargaining agreements, the company reserves the right to terminate the employee benefit Plans. A Plan termination may result in the denial or loss of benefits that a participant or beneficiary might otherwise expect to receive.
> * * *
> **Insurance**
>
> If the Insurance Plan were to terminate, medical benefits would be payable only for services or materials received, and hospital confinements which commenced, prior to the date of termination; and disability benefits would be payable only for disabilities that commenced prior to such date.

*(Id., ¶ 13, Ex. 3, p. 98.)*

D.    *Expiration of the 1988 Labor Contracts and the 1992 Unilateral Implementations*

Prior to the expiration of the 1988 labor contracts, both Caterpillar and the UAW

9

gave notice in July 1991, pursuant to Section 8(d) of the National Labor Relations Act, of their intent to terminate and negotiate modifications to the 1988 labor contracts, including the 1988 IPA. *(Id.,* ¶ 14, Exs. 4-5.) Thereafter in the fall of 1991, Caterpillar and the UAW commenced negotiations. *(Id.,* ¶ 15.) A labor dispute quickly emerged regarding acceptable terms for the successor agreements. *(Id.)* Caterpillar's proposals included, *inter alia*: (a) the introduction of a health care network, whereby active employees and retirees within a covered area would be required to receive

services from an "in-network" provider, or else pay a defined percentage of the cost of the services; and (b) monetary limits or "caps" on the amounts Caterpillar would pay for future retiree health coverage. *(Id.,* ¶ 16.) Caterpillar and the UAW provided information regarding these proposals to represented employees. *(Id.,* ¶ 17, Exs. 6-7.)

On September 28, 1991, Caterpillar and the UAW agreed to extend the 1988 labor contracts. *(Id.,* ¶ 18.) This extension continued until midnight on November 3, 1991, when the UAW canceled the extension, terminated the 1988 labor contracts, and commenced a selective strike at certain CLA facilities. *(Id.)* The only exception was at those CLA facilities covered by a

separate agreement negotiated by Caterpillar and the UAW called the Caterpillar Logistics Services ("CLS") Agreement. *(Id.,* ¶ 19, Ex. 8.) The CLS Agreement continued the 1988 labor contracts for CLA employees working at a facility covered by the CLS Agreement until after the parties negotiated a successor labor agreement. *(Id.,* ¶ 19, Ex. 8, p. 5.) Plaintiffs Winnett and Dailey were CLS workers who retired in 1996 and 1994, respectively. (Am. Compl. ¶¶ 6,9, Docket No. 61).

By letter dated March 5, 1992, Caterpillar advised the UAW that it believed the parties' negotiations were at a legal impasse. *(Id., ¶ 20.)* Thereafter, by letters dated March 31, 1992, Caterpillar advised the UAW and its UAW-represented employees that, effective April 6, 1992, the Company would unilaterally implement portions of its final contract offer. *(Id., ¶ 20, Exs. 9-10.)* The terms to be implemented included the health care network provisions applicable to active and retired employees. *(Id., ¶ 20.)*

E.       *The UAW's Response to Caterpillar's Implementation*

In response to Caterpillar's announcement, the UAW expanded the work stoppage it had commenced in November 1991. *(Id., ¶ 21.)* The UAW, disagreeing that Caterpillar had the right to institute new terms of employment, also filed unfair labor practice charges with the NLRB, alleging that Caterpillar's unilateral action violated § 8(a)(5) of the NLRA because no lawful impasse existed in the parties' negotiations. *(Id., ¶ 21.)* The NLRB investigated the UAW's allegations and determined the charges had no merit. *(Id.)* Caterpillar then was entitled to declare and unilaterally implement its proposed changes. The UAW then withdrew the charges. *(Id., ¶ 21.)*

While the UAW's charges were pending, it announced on April 14, 1992 that it was recessing its work stoppage against Caterpillar and ordering its members back to work. *(Id., ¶ 22.)*[7]

_____

[7]Relying on the Seventh Circuit's decision in *McNealy v. Caterpillar Inc.,* 139 F.3d 1113, 1120-23 (7th Cir. 1998), the defendant contends that the UAW's action in this regard created an implied-in-fact successor labor contract that included the terms Caterpillar implemented in 1992. However, the plaintiffs posit that decision was subsequently vacated by a 2000 NLRB ruling. (Docket No. 113 at 6).

11

F.     *Caterpillar's Second Unilateral Implementation*

After the UAW recessed its strike and UAW-represented employees returned to work under Caterpillar's implemented terms, the parties continued to negotiate over the terms of successor labor contracts. *(Id., ¶ 23.)* These negotiations during the remainder of 1992 did not produce an agreement. *(Id.)* Accordingly, by letter dated November 20, 1992, Caterpillar advised the UAW that, effective December 1, 1992, it would unilaterally implement additional provisions of its final offer, including the above-described caps on the amount Caterpillar would pay for future retiree health coverage for post-January 1, 1992 retirees. *(Id., ¶ 24; Ex. 11.)* A summary of these changes was sent to all UAW-represented employees and affected retirees. *(Id., ¶ 25; Ex. 12-13.)* Unlike the April 1992 implementation, the UAW did not file charges with the NLRB or otherwise seek to challenge the December 1992 implementation. *(Id., ¶ 26.)*

The following employees were eligible to retire prior to January 1, 1992, but had not retired by January 1, 1992: Chittum, Grogan, Hammer, Waterfield, and Finn. (Am. Compl. ¶¶ 51, 52, Docket No. 61). Of those, Grogan, Hammer, and Waterfield retired in April or May of 1992. *(Id. ¶¶ 10, 11, 12).*

G.     *The 1998 CLA and Establishment of the VEBA*

Caterpillar and the UAW continued negotiations until March 1998, at which time they reached agreement on comprehensive successor labor contracts that incorporated, *inter alia,* the unilaterally implemented retiree health care provisions described above (i.e., the networks and the caps). *(Id., ¶ 27.)* Like the 1988 CLA, the new 1998 CLA did not contain any health insurance provisions. *(Id.)* Rather, the parties agreed to a new IPA (the "1998 IPA") with appended GIP (the "1998 GIP) that contained the amended provisions. *(Id., ¶ 27, Exs. 14-15.)*

12

According to the defendant but disputed by the plaintiffs, the terms of the 1998 labor contracts were applied retroactively to 1992, and ratified the implementation of the 1992 retiree health cost caps previously instituted. *(Id.*, ¶ 28; Ex. 16.)* The parties also entered into a Labor Dispute Settlement Agreement that resolved all pending litigation and related issues arising out of the 1992-98 labor dispute. *(Id.,* ¶ 29, Ex.17, pp. 2-3.)* According to the defendant, at that time, Caterpillar and the UAW, in accordance with the terms of the CLS Agreement, applied the terms of the 1998 labor contracts to the employees and retirees covered by the CLS Agreement, including the named plaintiffs who were CLS retirees. *(Id.,* ¶ 28. )* According to the plaintiffs, however, by March 16, 1998, the plaintiffs and putative class members had retired and were no longer represented by the UAW. Thus, the retirees could not participate in the ratification of the 1998 labor agreements, making any changes in the 1998 agreements inapplicable to them as retirees. (Docket No. 80 at 11).

Concurrent with the above agreements, Caterpillar and the UAW also agreed to contribute approximately $35 million in funds previously accrued for active employees under the 1988 CLA to a voluntary employee benefits association[8] ("VEBA"). *(Id.,* ¶ 30, Exs. 18-19.)* The VEBA was independent of Caterpillar and was created to pay expenses incurred by post-January 1, 1992 covered retirees and their dependents, over and above the caps implemented by Caterpillar in 1992. *(Id.,* ¶¶ 30-31, Ex. 20.)* Beyond agreeing to the redistribution of this money, Caterpillar made no promise to provide any additional or future funding to the VEBA. *(Id.,* ¶ 30.)*

---

[8]*See* 26 U.S.C. § 501(c)(9) (VEBA is a tax-exempt program providing to members, their dependents, or designated beneficiaries life, sick, accident, or other benefits "if no part of the net earnings of such association inures (other than through such payments) to the benefit of any private shareholder or individual.").

H. *Events in 2004-05*

By the time the 1998 labor contracts were nearing expiration, the money Caterpillar and the UAW had agreed to contribute to the VEBA was almost completely depleted. *(Id., ¶ 32.)* Accordingly, by letters dated December 2, 2002, September 2, 2003 and July 9, 2004, affected retirees were again advised that, consistent with the terms of the 1998 IPA and GIP, if and when the money in the VEBA was exhausted, the retirees could or would have to begin paying premiums in the amount of health care coverage costs that exceeded the caps. *(Id., ¶ 32; Exs. 21-23.)*

Caterpillar and the UAW then commenced negotiations over successor labor contracts and eventually agreed upon terms of successor labor contracts in 2004. *(Id., ¶ 33.)* Once again, their agreement included an IPA (the "2004 IPA") and a GIP (the "2004 GIP"). *(Id.)* In pertinent part, Caterpillar and the UAW agreed that, rather than having retirees pay 100 percent of the costs of retiree health insurance above the caps (as had been previously established in 1992 and allegedly ratified in 1998), on a going forward basis, the Company would share in the "above the cap" costs on a 40/60 basis. *(Id.)*

In 2005, Caterpillar announced its intention to begin charging health care premiums to surviving spouse Chittum. On March 28, 2006, Caterpillar voluntarily decided to waive premiums for any existing surviving spouses who would otherwise be required to pay premiums under the 2004 IPA and GIP. *(Id., ¶ 34; Ex. 24.)* All affected surviving spouses were advised of that fact and, to date, have not been charged any premiums. *(Id., ¶ 34).*

III. <u>Standard of Review</u>

The defendant has brought this motion pursuant to Federal Rules of Civil Procedure 12(b)(1)

14

and 12(b)(6). When a defendant attacks subject matter jurisdiction under Rule 12(b)(1), the plaintiff must meet the burden of proving jurisdiction. *Golden v. Gorno Bros., Inc.,* 410 F.3d 879, 881 (6th Cir. 2005). In addition, the district court is empowered to resolve factual disputes when necessary to resolve challenges to subject matter jurisdiction. *United States v. Ritchie,* 15 F.3d 592, 598 (6th Cir. 1994), *cert. denied,* 513 U.S. 868, 115 S. Ct. 188, 130 L.Ed.2d 121 (1994). In so doing, the court may consider evidence outside the pleadings, and the record may be supplemented by affidavits. *Nichols v. Muskingum Coll.*, 318 F.3d 674, 677 (6th Cir. 2003); *Rudd v. Baker Furniture*, 967 F. Supp. 984, 989 (M.D. Tenn. 1997). The court can do so without converting the Rule 12(b)(1) motion into a motion for summary judgment. *Rudd*, 967 F. Supp. at 989 (citing *Ohio Nat'l Life Ins. Co. v. United States*, 922 F.2d 320, 325 (6th Cir. 1990)).

In deciding a motion to dismiss for failure to state a claim under Rule 12(b)(6), the court construes the complaint in the light most favorable to the plaintiff and will accept as true the facts as the plaintiff has pleaded them. *Inge v. Rock Fin. Corp.,* 281 F.3d 613, 619 (6th Cir. 2002); *Performance Contracting, Inc. v. Seaboard Surety Co.,* 163 F.3d 366, 369 (6th Cir. 1998). "A complaint must contain either direct or inferential allegations with respect to all material elements necessary to sustain a recovery under some viable legal theory." *Performance Contracting,* 163 F.3d at 369. The court will not dismiss a complaint for failure to state a claim unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Myers v. United States,* 636 F.2d 166, 168-69 (6th Cir. 1981) (quoting *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S. Ct. 99, 2 L.Ed.2d 80 (1957)). This narrow inquiry is based on whether "the claimant is entitled to offer evidence to support the claims," not whether the plaintiff can ultimately prove the facts alleged. *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 511, 122 S. Ct. 992, 152

15

L.Ed.2d 1 (2002) (quoting *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S. Ct. 1683, 40 L.Ed.2d 90

(1974)).

"Indeed it may appear on the face of the pleadings that recovery is very remote and unlikely but

that is not the test." *Id.* Rather, challenges to the merits of a plaintiff's claim should be "dealt

with through summary judgment under Rule 56." *Swierkiewicz,* 534 U.S. at 514.

IV.    Analysis

     A.    *The court has jurisdiction over the plaintiffs' Section 301 LMRA claims.*

     Caterpillar contends that the court lacks jurisdiction to decide the plaintiffs' Section 301

LMRA claims for benefits that allegedly arose under an expired or superseded labor contract.

According to the defendant, the plaintiffs ground their claims in the 1988 IPA and appended

GIP, and because that contract expired in November 1991 and was thereafter superseded by a

variety of successive actions and agreements, the court lacks jurisdiction over the plaintiffs'

amended complaint.  In support of its position, Caterpillar cites *Bauer v. RBX Indus., Inc.*, 368

F.3d 569, 579 n.5 (6th Cir. 2004)("a federal court does not have jurisdiction to hear a § 301 claim

premised upon an expired or superseded contract"); *Heussner v. Nat'l Gypsum Co.*, 887 F.2d

672, 676 (6th Cir. 1989)(same); and *Adcox v. Teledyne, Inc.*, 21 F.3d 1381 (6th Cir. 1994)(same).

     However, the facts of the cases relied on by the defendant to support its contention that

the court lacks subject matter jurisdiction are distinguishable.  In *Heussner*, the plaintiffs sought

to collect benefits accruing after the expiration of a CBA, on the theory that the successor

agreement was entered into invalidly.  887 F.2d at 677.  The Sixth Circuit determined that the

district court lacked jurisdiction under § 301(a) over questions of the validity of collective

bargaining contracts.  *Id.*  In *Bauer*, which involved a hybrid § 301 claim (unlike the instant

16

case), the union reached a settlement that abrogated the previous CBA and extinguished benefits that had been provided by the prior CBA. 368 F.3d at 579. The Sixth Circuit held that: "The only contract in existence . . . was the Settlement. The Plaintiffs do not allege that RBX breached the Settlement, and to the extent they argue the Settlement was invalid, '[d]istrict courts do not . . . possess subject matter jurisdiction under Section 301(a) in cases concerning the validity of a contract.'" *Id.* at 578-79. The court specifically rejected the plaintiffs' claim that the benefits sought had vested and thus could not have been affected by the settlement, "given that the terms of the Plans either specifically disclaim[ed] vesting or [were] silent on the issue." *Id.* at 584. *Adcox* involved a hybrid § 301 claim of "special distribution" benefits that did not vest before they were abolished by a successor contract, which the plaintiffs challenged as invalid. 21 F.3d 1381. The Sixth Circuit found that the district court had properly determined that it lacked jurisdiction to entertain a challenge under § 301 to validity of a CBA that had been superseded by a settlement agreement. *Id.* at 1388-89.

In this case, the plaintiffs seek to collect benefits that they claim accrued or vested *before* the CBA's expiration on November 3, 1991. Thus, unlike the plaintiffs in *Heussner*, *Bauer*, and *Adcox*, the instant plaintiffs do not challenge the validity of any CBA or related agreement. Neither do the plaintiffs seek to modify any CBA or related agreement. Instead, these plaintiffs contend that the benefits they seek vested before ratification of a new contract, and thus survived. *See Int'l Union UAW v. Yard-Man, Inc.*, 716 F.2d 1476, 1479-80 (6th Cir. 1983)("In settling a claim for vested benefits, the retiree does not modify the collective bargaining agreement."). *Heussner*, *Bauer*, and *Adcox,* then, are not controlling.

More specifically, the plaintiffs allege that they and the putative class became vested in

17

lifetime no-cost retiree medical benefits at least by when they became eligible for immediate commencement of a monthly pension, or when they retired and began receiving a pension. Under the plaintiffs' theory, they accepted Caterpillar's offer for lifetime no-cost healthcare coverage by performing work for Caterpillar under the labor agreements, benefit plans, benefit booklets, and SPD's and by fulfilling the service requirements necessary for the receipt of an immediate pension upon retirement. The plaintiffs claim that they and their deceased spouses provided the requisite service to vest in the benefits by working for Caterpillar and becoming eligible for the immediate commencement of a monthly pension. Once Caterpillar made the offer of retiree medical benefits at no cost, in return for completion of the requisite service necessary for the immediate receipt of a pension upon retirement, with no reservation of rights (as in the 1970 SPD and as reconfirmed in the 1978 benefit plan), Caterpillar could no longer revoke the offer once the plaintiffs and the class accepted it by their performance.

Caterpillar adamantly argues that the plaintiffs have no vested right to lifetime health benefits because, in the SPD's, Caterpillar expressly reserved the right to modify or terminate retiree health coverage. The defendant further argues that the plain language of the CBA excludes the coverage to which the plaintiffs claim they are entitled.

Section 301(a) of the LMRA provides federal jurisdiction over claims alleging breach of a CBA. 29 U.S.C. § 185(a); *see Armistead v. Vernitron Corp.*, 944 F.2d 1287, 1293 (6th Cir. 1991); *Adcox*, 21 F.3d at 1385; *Textron Lycoming Reciprocating Engine Div., Avco Corp. v. UAW*, 523 U.S. 653, 656-57, 118 S. Ct. 1626, 1678-79 (1998). Although a retiree health care benefit plan constitutes a welfare benefit plan under ERISA, 29 U.S.C. § 1001 *et seq.*, unlike pension benefit plans, retiree health care benefit plans are not subject to mandatory vesting

Case 3:06-cv-00235   Document 120   Filed 05/16/07   Page 18 of 44 PageID #: 3470

requirements.  *Maurer v. Joy Techs., Inc.*, 212 F.3d 907, 914 (6th Cir. 2000).  If lifetime health care benefits exist for the plaintiffs, it is because the UAW and Caterpillar agreed to vest a welfare benefit plan. *Golden v. Kelsey-Hayes Co.*, 73 F.3d 648, 654 (6th Cir. 1996); *see also Boyer v. Douglas Components Co.,* 986 F.2d 999, 1005 (6th Cir. 1993).

If a welfare benefit has not vested, "'after a CBA expires, an employer generally is free to modify or terminate any retiree medical benefits that the employer provided pursuant to that CBA.'" *Bittinger v. Tecumseh Prods. Co.,* 83 F. Supp.2d 851, 857 (E.D. Mich.1998) (quoting *Am. Fed'n of Grain Millers v. Int'l Multifoods,* 116 F.3d 976, 979 (2d Cir. 1997)). If a welfare benefit has vested, the employer's unilateral modification or reduction of those benefits constitutes a LMRA violation. *Maurer,* 212 F.3d at 914; *Yolton v. El Paso Tenn. Pipeline Co.,* 435 F.3d 571, 578 (6th Cir. 2006).  "If the parties intended to vest benefits and the agreement establishing this is breached, there is an ERISA violation as well as a LMRA violation.*" Maurer*, 212 F.3d at 914 (citation omitted).  Whether the parties to a CBA provided for health insurance benefits for retirees that would vest upon eligibility for retirement is a question of the intent of the parties.  *See Yard-Man*, 716 F.2d at 1476.  Therefore, the plaintiffs' claims require us to interpret the CBA, and the suit is properly before the court under Section 301 of the LMRA, 29 U.S.C. § 185.

The defendant also contends that the NLRB, not the federal courts, has jurisdiction over the plaintiffs' claims.  (Docket No. 76 at 16-17).  However, the plaintiffs do not allege that Caterpillar committed an unfair labor practice under the NLRA.  The plaintiffs instead complain that Caterpillar breached the 1988 CBA.  The plaintiffs' claims implicate facts and occurrences arising before expiration of the labor contract, reference rights expressly alleged to have vested

Case 3:06-cv-00235   Document 120   Filed 05/16/07   Page 19 of 44 PageID #: 3471

under the 1988 contract, and allege the rights survived the end of the agreement.

   B.   *The Court has jurisdiction over the plaintiffs' ERISA claims.*

The court's ruling as to jurisdiction over the plaintiffs' Section 301 LMRA claims does not automatically determine its ruling as to jurisdiction over the plaintiffs' ERISA claims because "the court's power to entertain the ERISA claims springs from a different statutory provision, as the court has jurisdiction over a § 1132(a)(1)(B) action pursuant to 29 U.S.C. § 1132(e)(1)." *Bauer*, 368 F.3d 569, 582 (finding that the court lacked jurisdiction over the plaintiffs' ERISA claims, and specifically rejecting the plaintiffs' claims that their welfare benefits had vested because the terms of the plans either specifically disclaimed vesting or were silent on the issue).    Precedents such as *Adcox*, *Heussner*, and *Bauer* dictate that federal courts have no power to hear an ERISA claim regarding a welfare benefit plan that has been superseded. *Bauer*, 368 F.3d at 584.  However, the plaintiffs here assert that their rights to no-cost lifetime health benefits had vested contractually before termination of the CBA, and, therefore, the Union could not bargain them away and Caterpillar cannot now refuse to pay them. The same argument was made by the plaintiffs in *Adcox*. *See* 21 F.3d 1381, 1388-89.  There, the court found that, because the benefits did not by the terms of the governing contract vest, and the CBA had been superseded by a subsequent contract, the district court lacked jurisdiction under § 1132 to entertain a challenge to the first agreement's validity.  *See id.*  Here, however, the court has previously found that the pertinent language evidences an intent for the plaintiffs' benefits to vest.  In addition, the court has found that plaintiffs are not challenging the validity of any contract.   Thus, as the court has jurisdiction over the instant plaintiffs' Section 301 LMRA

20

claims, so does the court over the plaintiffs' ERISA claims under Sections 502(e) and (f) of

ERISA, 29 U.S.C. § 1331.

    C.    *The plaintiffs have a vested right in no-cost lifetime retiree health benefits, and that right vested when the plaintiffs attained retirement or pension eligibility.*

The CBA's are contracts and, as a result, the court applies general principles of contract law to determine whether the retiree benefits sought in this case are vested. *Yard-Man*, 716 F.2d at 1479-80. *Yard-Man* recognized that parties to CBA's can agree to vest benefits that survive the termination of the agreement. *Id.* at 1479. Whether the benefits vest depends upon the intent of the parties. *Golden,* 73 F.3d at 654. "Courts can find that rights have vested under a CBA even if the intent to vest has not been explicitly set out in the agreement." *Maurer,* 212 F.3d at 915. In *Golden,* the Sixth Circuit clarified that, in determining the intent of the parties to a CBA, "basic rules of contract interpretation apply." *Golden,* 73 F.3d at 654.

Courts "should first look to the explicit language of the collective bargaining agreement for clear manifestations of intent." *Yard-Man,* 716 F.2d at 1479. Moreover, courts "should also interpret each provision in question as part of the integrated whole. If possible, each provision should be construed consistently with the entire document and the relative positions and purposes of the parties." *Id.* As in all contracts, the collective bargaining agreement's terms must be construed so as to render none nugatory and avoid illusory promises. *Id.* at 1479-80. When ambiguities exist, courts may look to other words and phrases of the document and other extrinsic evidence. *Id.* at 1480; *see also Golden,* 73 F.3d at 654; *UAW v. BVR Liquidating*, 190 F.3d 768, 774 (6th Cir. 1999)(extrinsic evidence is admissible to determine an intent to vest benefits when the language of the collective bargaining agreement is ambiguous). The court should review the interpretation ultimately derived from its examination of the language,

21

context, and other indicia of intent for consistency with federal labor policy. *Yard-Man*, 716 F.2d at 1479-80. With these principles in mind, the court considers whether the instant plaintiffs have a vested right to lifetime no-cost health care coverage.

a. *Express Language of the CBA, IPA, and GIP*

The governing CBA contains no provisions related to health benefits. Retiree health benefits are addressed in two other documents, the IPA and the GIP. The IPA, like the CBA, was effective by its terms until October 1, 1991. But, neither the IPA nor the GIP contains durational language linking the end of the offer of the retirement plan to the end of the CBA. In fact, the IPA expressly states: "Termination of this Agreement shall not have the effect of automatically terminating the Plan." "The Plan" refers to the GIP. The relevant language of the GIP is as follows:

> 5.15 Retiree Medical Insurance. Retired Employees who satisfy the requirements hereinafter set forth shall be entitled to the same benefits provided in this Section V as if they were Employees. Coverage in accordance with this paragraph 5.15 shall be provided without cost to any such retired Employee **if** he has at least 5 years of credited service under the Non-Contributory Pension Plan at his retirement **and** is eligible for the immediate commencement of a monthly pension under the Non-Contributory Pension Plan **or** would be eligible for such immediate commencement but for his election to defer commencement of the pension. Coverage shall take effect on his retirement date.

(1988 GIP, Ex. 2 to Docket No. 76)(emphasis added). Significantly, this language links retiree medical benefits to pension eligibility. The Sixth Circuit has held that this constitutes strong evidence of vesting. For example, in *Yolton*, a 2006 case, the Sixth Circuit affirmed the district court's finding that the plaintiffs' benefits had vested, explaining that

22

> . . . the district court interpreted the language of the agreement and
> found evidence that the defendants intended to confer lifetime
> benefits upon the plaintiffs. Of particular significance to the
> district court was language in the Group Insurance Plan that tied
> benefits to the pension plans . . . . Because the pension plan is a
> lifetime plan and the health insurance benefits are tied to the
> pension plan, the district court found that the health insurance
> benefits were vested and intended to be lifetime benefits.

435 F.3d at 580. In *Golden*, similar language in each of the CBA's tied retiree benefits and

surviving spouse eligibility for health insurance coverage to eligibility for vested pension

benefits. 73 F.3d at 656. The Sixth Circuit affirmed the district court's finding that, "[s]ince

retirees are eligible to receive pension benefits for life . . . the parties intended that the company

provide lifetime health benefits as well." *Id.* Similarly, in *McCoy v. Meridian Auto. Sys., Inc.*,

390 F.3d 417 (6th Cir. 2004), the Sixth Circuit affirmed the district court's finding that the retiree

plaintiffs had established a likelihood of success on the merits of their claim. *Id.* at 426. After

finding that the collective bargaining agreement in that case incorporated a supplemental

agreement, the Court held, "Because the Supplemental Agreement ties eligibility for retirement-

health benefits to eligibility for a pension, in other words, there is little room for debate that the

retirees' health benefits vested upon retirement under *Golden* . . . ." *Id.* at 422*; see Cole v.

ArvinMeritor, Inc.*, 2006 WL 2620305, *7 (E.D. Mich. 2006)(because, *inter alia*, the governing

contract ties retiree health benefits to pension status, it "constitutes an enforceable contractual

promise of lifetime retiree health benefits to accompany lifetime pension benefits.").

Likewise, in this case, the language of paragraph 5.15 of the GIP unambiguously ties

retiree health benefits to pension eligibility. Under the controlling law, such language

constitutes strong evidence of an intent to vest.

23

b.     *The Yard-Man inference*

Second, the negotiating context in which the benefits arose indicates that the benefits were intended to be vested. "Retirement benefits are typically understood as a form of delayed compensation for present services, for which workers forego present wages." *Terrell v. Dura Mech. Components, Inc.*, 934 F. Supp. 874, 881 (N.D. Ohio 1996)(citing *Allied Chem. Workers v. Pittsburgh Plate Glass Co.*, 404 U.S. 157, 180)). As one court remarked: "It is unlikely that workers would leave a significant portion of their remuneration to the contingencies of future bargaining agreements, especially since they are presumably aware that the union is not obliged to bargain for continued benefits for retirees." *Id.* (*citing Yard-Man*, 716 F.2d at 1482).

Indeed, the Sixth Circuit in *Yard-Man* explained that retiree benefits are, in a sense, "status" benefits that carry an inference that they continue as long as the requisite status is maintained. *Yard-Man*, 716 F.2d at 1483. "This contextual factor," according to the Sixth Circuit, can buttress "the already sufficient evidence of such intent in the language of the agreement itself." *Golden*, 954 F. Supp. at 1184 (citing *Yard-Man*, 716 F.2d at 1482).

Although the *Yard-Man* decision has generated controversy and its viability has been challenged, *Yard-Man* remains good law. *See Yolton*, 435 F.3d at 579-80 ("There is no need to revise, reconsider, or overrule *Yard-Man*."); *Golden*, 73 F.3d at 656 ("After considering the arguments the defendant makes, and the cases it cites, we conclude that *Yard-Man* is still good law, and controls this case.")

24

c.      *Extrinsic evidence/Caterpillar's course of conduct*

Next, even if the language of the GIP was ambiguous, there is also extrinsic evidence that Caterpillar intended to extend the right to no-cost lifetime health care benefits to those employees who, at the time they retired, were *eligible* for an immediate pension, including those who retired *after* the expiration of the 1988 labor agreements.  For example, Plaintiff Jackson-Chittum's spouse retired in 1994, undisputably after the expiration of the 1988 labor agreement. Shortly after he passed away on June 3, 2002, she received a letter from Caterpillar stating: "[y]ou will continue to have retired survivor coverage for your lifetime, at no cost For [sic] you and your covered dependents."  (Decl. Jackson-Chittum, Ex. 1 to Docket No. 84).   Such assurances by Caterpillar evidence an intent by Caterpillar to provide lifetime no-cost medical benefits.       *See Cole*, 2006 WL 2385050, at *13-14 (finding "lifetime" assurance letters to be admissions by defendants of their intent to provide lifetime retiree health benefits; finding letters reflected company policy and were admissions by defendant of the lifetime duration of retiree health benefits); *Golden*, 954 F. Supp. at 1188 (citing defendants' benefits representatives' written assurances of lifetime health coverage).

Additionally, the plaintiffs allege that Caterpillar continues to provide retiree healthcare coverage for life at no cost to former retirees and their spouses who were eligible for immediate commencement of a monthly pension, so long as they retired prior to January 1, 1992.  (Am. Compl. ¶ 31, Docket No. 61).  Thus, Caterpillar's course of conduct shows its intent was for  the 1988 labor agreements to provide no-cost lifetime retiree health benefits not only to those employees who retired and were eligible for a pension, but to those employees who were retirement-eligible before the adoption of a new CBA.

25

Beginning in 1970, the SPD provided by Caterpillar promised that medical benefits would be "continued at no cost" to eligible retirees.  The 1979 IPA provided that retired employees who met the requirements outlined in the plan "shall be entitled" to the same benefits "as if they were Employees . . . without cost."  These same or similar assurances were repeated in the 1983 and 1986 SPD's.   Throughout, Caterpillar also promised surviving spouses of retirees that no-cost medical coverage "will be continued for his or her lifetime."  In fact, the 1986 SPD clearly states that a surviving spouse "will have"  "lifetime" coverage "at no cost" if an active employee dies "when *eligible* to retire" *or* if a retired employee dies.  In *Cole*, the court found that the defendants' acknowledgement of the lifetime duration of retiree health benefits is reflected, *inter alia*, in the decades of company health benefit booklets and SPD's which promised that company-paid retiree health benefits are "for life" and "will be continued during your retirement" for retirees and dependents.  The agreement language--"shall be continued thereafter"--and the booklet language--"will be continued during your retirement"--are "definitive proof that the duration of retiree health benefits coincides with the duration of retirement.  *Cole*, 2006 WL 2385050, * 14.  In the same way, the plaintiffs have presented evidence that Caterpillar intended no-cost retiree medical benefits to last for life.

The defendant points to language in the 1988 SPD  which, it claims, reserves to Caterpillar the right to unilaterally alter the benefits.  (Docket No. 75 at 17).  However, a reservation-of-rights clause cannot be used to cancel contractually vested rights.  The Sixth Circuit has held that the general reservation of rights language cited by Caterpillar is insufficient to dispel an inference of vesting.  When the reservation language is qualified by reference to the

26

applicable collective bargaining agreements, as it is here, the reservation does not excuse the company from its contractual obligations. *See Yolton*, 435 F.3d 571, 582 (rejecting the defendant's argument that reservation of right in SPD permitted the modification of retirement benefits in finding that the "right to modify the Group Insurance Plans is expressly limited to the terms of the [CBA's]. Because the district court found that the CBA creates the vested lifetime benefits, the court further concluded that this language does not reserve to the defendants the right to modify those benefits."); *McCoy*, 390 F.3d 417, 424 (finding that the SPD's upon which defendant relies do not "establish a termination right without reference to the collective bargaining agreement and the limitations on that right included in the agreement." *Cf Maurer*, 212 F.3d 907 (6th Cir. 2000)(finding the reservation effective where the reservation was not generic (like Caterpillar's), but specific, and where the booklet did not contain a provision (which is in the Caterpillar booklet) that the negotiated contracts control). Thus, although two of the SPD's contain reservation of rights language, under Sixth Circuit precedent, these reservations do not excuse Caterpillar from its contractual obligation to provide lifetime, no-cost medical benefits.

To summarize, in interpreting the language of the relevant documents, the court finds evidence that Caterpillar intended to confer lifetime vested retiree medical benefits upon the plaintiffs. In addition, looking to the larger context in which the agreement exists, the court finds that extrinsic evidence supports its determination that the parties intended the retirement benefits to survive the expiration of the CBA.

Having determined that the CBA creates a vesting right in the benefits at issue, the court must next address the issue of when that right vested. The plaintiffs contend that the right vests

as soon as the employee is eligible for retirement, whether the employee actually takes retirement at that time or delays retirement. The plaintiffs concede that the benefits do not begin, in the words of ¶ 5.15, until "after his retirement." However, the plaintiffs point to the mandatory language of ¶ 5.15 stating that a retiree "shall be entitled to" the benefits when he or she "satisfies the requirements hereunder," which include eligibility for the immediate commencement of a monthly pension (or would be eligible for such immediate commencement but for an election to defer commencement of a pension) and at least five years of credited service. Any ambiguity in the CBA language, the plaintiffs argue, is resolved by other provisions in the CBA or by extrinsic evidence which demonstrates Caterpillar's intent that the right vests upon eligibility for retirement. The defendant, on the other hand, argues that the right does not vest until the employee actually takes retirement. Since none of the plaintiffs in this action retired until after the expiration of the CBA, argues the defendant, the CBA expired without the plaintiffs' rights ever vesting, and they are not eligible for the retirement insurance benefits.[9]    The same issue was presented in *UAW v. Park-Ohio Indus., Inc.*, 661 F. Supp. 1281 (N.D. Ohio 1987), *rev'd in part*, 876 F.2d 894 (6th Cir. 1989). There, employees who were eligible for early retirement before expiration of a labor contract, but who did not retire until after the contract had expired, filed suit alleging breach of a CBA and ERISA violations after their former employer refused to provide them with health and hospitalization benefits. The

---

[9]Accepting the plaintiffs' allegations as true, as the court must at this stage of the proceedings, at least some of the CLS employees retired prior to the expiration of the governing CBA. These employees retired under the 1988 labor agreement, which, according to the plaintiffs, was extended for CLS employees until a new labor agreement was reached in March 1998. The defendant counters by claiming that the ratification of the 1998 agreement made it retroactive to 1992. With a great deal of discovery outstanding, the court anticipates this issue will be briefed thoroughly in forthcoming submissions by the parties.

district court found that, if their right to such benefits did not vest until the employee actually

took retirement, "longtime employees entitled to contractually vested health benefits would lose

them merely because they chose not to retire at an early date . . . . [T]he dissipation of benefits

otherwise vested would render them 'illusory.'" *Id.* at 1293. The district court therefore found

that it was not necessary for a beneficiary actually to be retired to have vested benefits that

would be payable when retirement status was taken, although such benefits were not payable

when the beneficiary is not retired. *Id.* The Sixth Circuit reversed the district court's grant of

summary judgment to the plaintiffs upon finding that the relevant language of the collective

bargaining agreement was ambiguous. 876 F.2d 894. The Sixth Circuit noted, however, that the

agreement contained a reading favorable to the plaintiffs. *Id.*

In *Armistead v. Vernitron Corp.*, 944 F.2d 1287 (6th Cir. 1991), on similar facts, the Sixth

Circuit adopted the same reasoning when affirming a district court's holding that retirement

insurance benefits vested at the time the employee became eligible for retirement, rather than the

time the employee actually retired. The court held that, if an employer had the right to terminate

a retiree benefits program unilaterally, its promise to provide retirement insurance benefits under

the CBA would be illusory. "Because [retirement insurance] benefits are deferred compensation,

it is unreasonable to suppose that the parties to the CBA intended to permit [the employer] to

terminate the retirement insurance program unilaterally." *Id.* at 1297.

Likewise, in *Terrell v. Dura Mech. Components, Inc.*, 934 F. Supp. 874 (N.D. Ohio

1996), a district court found that the retirement insurance benefits at issue in that case vested

when the employees became eligible for retirement. Comparing its plaintiffs to those in *Park-*

*Ohio*, the court found "the Plaintiffs in the case at bar would lose otherwise contractually vested

29

health benefits merely because they chose not to retire at an early date. [T]his Court is unaware of any similar situation where otherwise vested benefits may be forfeited merely because an employee remains part of the bargaining unit at the expiration of the collective bargaining agreement." *Id.* at 882; *see also UAW v. Cadillac Malleable Iron Co.*, G82-75 CA1 (W.D. Mich. Mar. 30, 1983)(the court held that "employees who had fulfilled all the requirements for retirement" prior to the commencement of a strike after expiration of a collective bargaining agreement were entitled to retiree insurance benefits); *Gilbert v. Doehler-Jarvis, Inc.*, No. 3:99 CV 7395 (N.D. Ohio June 28, 2001)(the court ordered benefits paid to "those employees who were eligible to retire prior to the expiration of the CBA but chose not to do so.").

Recently, in *Cole v. ArvinMeritor, Inc.*, 2006 WL 2620305 (E.D. Mich. 2006), the Sixth Circuit agreed with a district court's finding that the language in the governing CBA's showed that defendants intended that, "once retirement status is attained, health benefits are to continue thereafter, i.e., for the duration of retirement." *Id.* at *6 (citation and internal quotations omitted).

Caterpillar has not successfully distinguished these cases. Like the plaintiffs in the cases cited above, many of the instant plaintiffs would lose otherwise contractually vested health benefits merely because they chose not to retire at a certain date. If the court accepts Caterpillar's reading of the GIP, Caterpillar's promise to provide free lifetime medical benefits would be rendered illusory. Caterpillar could induce workers to provide years of faithful service to the company, with the promise of lifetime free medical benefits, and then unilaterally decide not to provide them, even after the worker had performed the requisite service and attained pension or retirement eligibility status. The court finds, therefore, that the retirement medical

30

insurance benefits at issue vested when the employees attained retirement or pension eligibility.

        D.        *The plaintiffs had no obligation to allege a breach of fair representation claim against their former bargaining agent, the UAW.*

Under Rule 12(b)(6), Caterpillar moves for dismissal of the plaintiffs' claims, alleging that, because claims "arising under the 1988 IPA and appended GIP would have been subject to arbitration at the time of the alleged breach, which the Union as their exclusive statutory bargaining representative chose not to bring, any Section 301 claim can only proceed as part of a hybrid claim." (Docket No. 75 at 19). To the extent that Caterpillar argues that the UAW never raised the duration of retiree health care benefits during the negotiations of the governing CBA's, and thereby indicated an intent for the benefits to terminate with the CBA, that argument lacks merit. As previously discussed herein, the evidence that the retiree health care benefits were intended as lifetime benefits prior to 1992 is substantial. "The UAW was not required to bring up negotiations for a benefit it already had." *See Gilbert v. Doehler-Jarvis, Inc*., 87 F. Supp. 2d 788, 793-94 (N.D. Ohio 2000). Under these facts, the court finds that the plaintiffs were not required to allege a breach of duty of fair representation claim against the UAW or to allege a hybrid claim against both the UAW and Caterpillar.

In addition, the plaintiffs contend that their claims did not accrue until after the class members had already retired. (*See discussion infra*.) Construing the plaintiffs' allegations in the most favorable light, as retirees and no longer members of the bargaining unit, the UAW had no obligation to represent them with Caterpillar. *See Pittsburgh Plate Glass*, 404 U.S. 157 at 181 n.20 ("Since retirees are not members of the bargaining unit, the bargaining agent is under no statutory duty to represent them in negotiations with the employer"). Thus, the plaintiffs have

no duty of fair representation claim against the UAW. *See Anderson v. AT&T Corp.*, 147 F.3d 467, 473 (6th Cir. 1998)(noting that "plaintiffs here have no fair-representation claim against either the CWA or the IBEW because neither union has the authority to assert claims on their behalf under the MFG-3 agreement.").

Retirees "have a federal remedy under § 301 . . . for breach of contract if [their] benefits were unilaterally changed." *Pittsburgh Plate Glass*, 404 U.S. at 182 n.20. This is precisely the course of action the plaintiffs here have decided to pursue. "[T]he Supreme Court has made clear that fair-representation suits against unions are not inextricably linked to Section 301 suits against employers." *Anderson*, 147 F.3d at 473 (citing *Breininger v. Sheet Metal Workers Int'l Ass'n*, 493 U.S. 67, 86 (1989)("a fair representation claim is a separate cause of action from any possible suit against the employer")). As the Sixth Circuit explained:

> In developing the principle stated by the Supreme Court in *Breininger*-that a Section 301 cause of action against an employer is logically distinct from a fair-representation cause of action against a union-we have recognized a number of situations in which individual plaintiffs, not personal signatories to a collective bargaining agreement, may nonetheless sue an employer for breach of a collective bargaining agreement without also suing the union. The most common is the situation in which the union owes no duty to the plaintiff because the plaintiff is not a member of the bargaining unit represented by the union. In these cases, we have long recognized that the plaintiff can recover for the employer's breach of a collective bargaining agreement if the plaintiff is a third-party beneficiary of the agreement. *See, e.g., United Food & Commercial Workers Local 951 v. Mulder,* 31 F.3d 365, 370 (6th Cir.1994) ("[a]lthough § 301 contemplates suits between unions and employers for breaches of collective bargaining agreements, it also permits individual employees to sue as third-party beneficiaries of collective bargaining agreements"); *Central States Southeast & Southwest Areas Pension Fund v. Kraftco, Inc.,* 799 F.2d 1098, 1107 (6th Cir.1986) (to same effect); *Hazen v. Western Union Telegraph Co.,* 518 F.2d 766, 769-70 (6th Cir.1975) (to same effect).

*Anderson*, 147 F.3d at 473; *see also Yard-Man, Inc.*, 716 F.2d at 1485 ("[e]ach retiree has an undisputable and effective remedy against the employer for a breach of contract under § 301(a)."). Thus, under the facts alleged, the court finds that the absence of a claim against the Union is not an impediment to this suit.

As the Sixth Circuit recognized in *Yard-Man*, by so holding, the court is not suggesting "that the union is without interest in the outcome of potential settlements between the employer and the retirees." 716 F.2d at 1486. Indeed, the Sixth Circuit has recognized that "[t]he fact that the retirees have an alternative remedy . . . does not preclude the Union from undertaking to represent the retirees' interests . . . . [T]he union would have standing to bring suit on behalf of the retirees to enforce their bargained-for benefits because the union had a 'direct interest in maintaining the integrity of the retiree benefits created by the collective bargaining agreement,' notwithstanding the fact that the retirees may choose to deal with the company on their own." *Cleveland Elec.*, 440 F.3d 809, 816 (quoting *Yard-Man*, 716 F.2d at 1486-87). The plaintiffs here have simply chosen to deal with the company on their own.

     E.    *The plaintiffs' ERISA and LMRA claims are timely.*

The defendant also seeks dismissal of the plaintiffs' claims under the LMRA and ERISA under Rule 12(b)(6) for failure to state a claim on grounds that the claims are time-barred under any applicable statute of limitations. The plaintiffs respond that a ten-year statute of limitations is applicable but argue that, even under the six-year statute of limitations urged by the defendant, their claims are timely.

Caterpillar contends that the plaintiffs' claims accrued in December 1992, and thus are

33

barred by the applicable six-month limitations period governing their Section 301/duty of fair representation claims. Alternatively, Caterpillar argues that, even if the plaintiffs' claims are considered not to have accrued in 1992, these claims accrued no later than March 1998 when the 1998 CLA was formally agreed to by Caterpillar and the UAW, ratified by the UAW membership, reduced to writing, and applied retroactively to 1992. Even under the latter scenario, Caterpillar urges that the plaintiffs' claims come seven years too late. Because the court has found that the plaintiffs do not have to allege a hybrid § 301/duty of fair representation claim, the plaintiffs were not required to meet the six-month statute of limitations applicable to such claims as the defendant posits.

There is no express statute of limitations that applies to Section 301 claims under the LMRA or to Section 502 claims under ERISA. *See Sterling China Co. v. Glass Molders, Pottery, Plastic, & Allied Workers, Local No. 24*, 357 F.3d 546, 552 (6th Cir. 2004)(Section 301 LMRA claims); *Meade v. Pension Appeals and Review Comm.*, 966 F.2d 190, 194 (6th Cir. 1992)(ERISA claims). As a general rule, courts borrow the most analogous state statute of limitations when there is no federal limitations period expressly applicable to a federal cause of action. *Champion Int'l Corp. v. United Paperworkers Int'l Union*, 779 F.2d 328, 331 (6th Cir. 1985)(quoting *DelCostello v. Int'l Brotherhood of Teamsters*, 462 U.S. 151, 158-60 (1966)). In the Sixth Circuit, "straight" Section 301 LMRA actions borrow their statute of limitations from the forum state, *Sterling China Co.*, 357 F.3d at 553, unless a party can demonstrate that the adoption of the forum state's limitation period will "substantially undermine federal labor policy or cause the parties undue hardship," *Champion*, 779 F.2d at 334 (citing *Consolidated Express,*

34

*Inc.*, 602 F.2d at 507-08).

Here, the forum state is Tennessee. In Tennessee, the most analogous statute of limitation is the six-year statute of limitation for breach of contract. *Tenn. Code Ann.* § 28-3-109. *See Haynes v. O'Connell*, 599 F. Supp. 59, 62 (E.D. Tenn. 1984)(in action for wrongful denial of pension benefits by retired employees, court applied Tennessee's six-year statute of limitations to plaintiffs' LMRA and ERISA claims); *see also Meade v. Pension Appeals and Review Comm.*, 966 F.2d 190, 194-95 (6th Cir. 1992)(the most analogous Ohio statute of limitation for an ERISA action for recovery of benefits to which the plan participant is entitled was fifteen-year limitation applicable to breach of contract claim). Caterpillar contends that the plaintiffs' Section 301 LMRA and ERISA claims are barred by Tennessee's six-year statute of limitations applicable to claims based on written agreements, whether the claims arose in 1992 or 1998.

The plaintiffs argue that the ten-year statute of limitations for breach of contract claims under Illinois law applies to the plaintiffs' LMRA and ERISA claims because the plans in dispute were entered into by the parties in Illinois and administered there, and Caterpillar is headquartered there.

The plaintiffs have not demonstrated that the adoption of Tennessee's limitation period will "substantially undermine federal labor policy or cause the parties undue hardship." *Champion*, 779 F.2d at 238. Indeed, for purposes of responding to Caterpillar's motion to transfer venue, the plaintiffs maintained that this court is the proper forum because Illinois purportedly had insufficient meaningful ties to the controversy. (Docket No. 35 at 8-13). Thus,

the court will apply Tennessee's six-year statute of limitations for breach of contract claims to the plaintiffs' LMRA and ERISA claims.

Yet, even applying the forum state's six-year statute of limitation, the plaintiffs contend their claims are timely. "A claim under § 301 accrues when the claimant discovers, or in the exercise of reasonable diligence should have discovered, the acts constituting the alleged violation. The determination of the accrual date is an objective one: the asserted actual knowledge of the plaintiffs is not determinative if they did not act as reasonable persons and, in effect, closed their eyes to evident and objective facts concerning the accrual of their right to sue." *Noble v. Chrysler Motors Corp.*, 32 F.3d 997, 1000 (6th Cir. 1994)(internal quotations and citations omitted).

In the ERISA context, "[a]lthough the statute of limitations may be borrowed from state law, it is federal law that determines the date on which a statute of limitations begins to run." *Michigan United Food and Commercial Workers Union and Drug*, 992 F.2d 594, 598 (6th Cir. 1993)(citations omitted). Thus, an ERISA claim accrues, and the limitations period begins to run, when the "plaintiff discovers, or with due diligence should have discovered, 'the injury that is the basis of this action.'" *Id.* at 597 (citations omitted); *see also United Steelworkers of Am., Local 2116 v. Cyclops Corp.*, 860 F.2d 189, 197 (6th Cir. 1988)(the statute of limitations begins to run when the company "fails to meet a pension obligation"). Recently, the Sixth Circuit further explained in the ERISA context, a cause of action accrues "when a fiduciary gives a claimant clear and equivocal repudiation of benefits that alone is adequate to commence accrual, regardless of whether the repudiation is formal or not." *Morrison v. Marsh & McLennan Cos., Inc.*, 439 F.3d 295, 302-03 (6th Cir. 2006).

36

In the court's application of the discovery rule to this case, the central question is when the plaintiffs should have become aware of Caterpillar's alleged breach of its contractual obligation to provide lifetime no-cost health benefits to retirees. The court also considers whether and at what point, if ever, Caterpillar unequivocally repudiated the plaintiffs' entitlement to lifetime no-cost retiree health benefits. The plaintiffs filed their Complaint on March 28, 2006; therefore, the action was timely only if it accrued after March 28, 2000. The defendant argues that the plaintiffs should have known no later than March 1998 of their potential cause of action, when the 1998 CLA was formally agreed to by Caterpillar and the UAW, ratified by the UAW membership, reduced to writing, and applied retroactively to 1992. Even under this circumstance, Caterpillar urges, the plaintiffs' claims come too late.

The plaintiffs, on the other hand, argue that Caterpillar did not begin charging retirees for a portion of their retiree medical insurance benefits until October 1, 2004.[10] It was at this point, say the plaintiffs, that the defendant first breached the controlling CBA's and ERISA plans, causing the plaintiffs the injuries from which they seek relief in this suit and triggering the

---

[10] According to Caterpillar, the plaintiffs' assertion that the defendant did not begin charging retirees for a portion of their retiree medical insurance benefits until October 2004 "is demonstrably wrong." (Docket No. 90 at 15 n.8). The defendant maintains that charges were imposed beginning in 1992. (*Id.* (citing Stevens Aff. ¶ 25, Exs. 12-13)). To buttress its argument, the defendant cites to the plaintiffs' allegation in the Amended Complaint that Caterpillar increased their expenses and co-payments. (*Id.* at n.8). However, in the cited section, the plaintiffs allege that, "*[a]fter* the receipt of the letter,*" which the plaintiffs allege was received in mid-April 2006, "Caterpillar continued to charge" the surviving spouses higher prescription co-pays, deductibles and out-of-pocket costs." (Docket No. 61 ¶¶ 77-78)(emphasis added). The plaintiffs further allege that, in 2005, Caterpillar announced its intention to begin charging plaintiff Jackson-Chittum, and similarly situated surviving spouses, retiree health care premiums effective 2006 (¶ 76), but it was not until October 1, 2004 that Caterpillar began charging plaintiff retirees and the class (and still not the surviving spouses) a monthly retiree healthcare premium deducted from their pension payments. (¶ 29).

Case 3:06-cv-00235   Document 120   Filed 05/16/07   Page 37 of 44 PageID #: 3489

running of the statute of limitations. Because the Complaint was filed in March 2006, less than two years after this date, the plaintiffs contend their claims are timely.

The plaintiffs allege that the 1992 implementation of the new retiree health plan was "indefinite and contingent on future events" and did not trigger the statute of limitations. According to the plaintiffs, Caterpillar never "clearly and unequivocally" informed plan participants that, on a date certain or at any future date, the defendant would begin charging retirees for a portion of their health benefits. The plaintiffs allege that the 1992 announcement and subsequent 1998 CLA and accompanying 1998 GIP stated only that, "if" health benefits continued to rise in the future, the defendant would be left with no choice but to begin charging retirees for a portion of their benefits beginning in January 2000. (Docket No. 61 ¶ 27). Essentially, Caterpillar told the plaintiffs that it would not be until 2000 that any premium charge would be assessed, and then only if the retiree health care costs rose above the 1999 cost level. Caterpillar communicated that "a lot can happen by then. As the health care crisis gets more attention, it becomes more likely that some national solutions will be found. By the time the cap is activated, the United States might have a national health care program which could eliminate the need for premiums." (Ex. 14 to Docket No. 114, P01003-04).

A 1998 notice of "Benefit Changes" provided by Caterpillar to retirees made it clear that the cap was still dependent on future events. In the paragraph entitled "Cap for Future Retiree Medical Benefits," Caterpillar notified retirees that the "VEBA . . . Trust Fund assets will be used to cover the difference in monthly premiums *after* the year 2000 until the trust assets are depleted. Retirees *may* be required to pay a monthly premium for coverage after the trust is depleted." (Ex. 15 to Docket No. 114, P00553)(emphasis added). *Cf Morrison*, 439 F.3d at 303

38

(letter by defendant denying participant's request for portable insurance "clearly and unequivocally repudiated Morrison's entitlement to the policy").

The November 1999 version of Caterpillar's Benefit Plan states: "Company contributions for health care benefits for employees who retired on or after January 1, 1992 are capped at the average annual cost per individual in 1997 and projected to 1999. Thereafter, the Company will continue to pay up to that amount each year for retiree health care benefits. *If* costs rise above that amount, beginning January 1, 2000, retirees will be required to contribute towards the cost of health care benefits in the form of a monthly premium." (Docket No. 83, Ex. 10, p.50) (emphasis added).

The plaintiffs allege that in 2000, Caterpillar still did not begin charging the plaintiffs for a portion of their health benefits. Instead, Caterpillar utilized the VEBA trust account, which had been established in 1998 by Caterpillar and the Union, to cover the additional costs of retiree benefits. (Docket No. 61 ¶¶ 27-29). Thus, the plaintiffs allege that, even in 2000, they were uncertain as to whether they would be charged at all, or when such charges would begin; thus, it would have been inappropriate for them to file suit at that time.

A December 2, 2002 letter from Caterpillar to retirees included the following language:

> Q:    **When, if ever, will the VEBA Trust run out of money?**
> A:    That's difficult to say, but assuming health care cost
>                   inflation, funding levels and investment experience
> remain      steady and there are no other changes, we estimate
> that the             VEBA trust will run out sometime in 2004.

(Ex. 21 to Stevens Aff., Docket No. 76)(emphasis in original).

Caterpillar's uncertain and conditional language continued even after the trust began to pay. Caterpillar sent a letter dated September 4, 2003, stating that "[*w]hen, and if*, the Trust is

39

depleted or is unable to fully pay the retirees portion of the monthly premium, post-January 1, 1992 retirees will be required to contribute that portion in accordance with the plan terms." (Ex. 9, P00560-61)(emphasis added). The letter further stated that Caterpillar's "projections indicated that the fund *may* be unable to continue covering these costs through 2004." (*Id.*)(emphasis added). Thus, as late as September 4, 2003, there was no certainty about when or if the charge would be necessary.

The court agrees with the plaintiffs that, because the wording of Caterpillar's communications regarding retiree benefits beginning in 1992 was so indefinite and contingent on future events, it could hardly have been clear to the plaintiffs that, years before the defendant actually began to make the challenged deductions, the plaintiffs had suffered an injury and that the statute of limitations on their claims had begun to run. *See Edwards v. U.S. Dep't of Energy*, 200 Fed. Appx. 382, 386 (6th Cir. 2006)(applying "common sense" approach from a layperson's perspective to determination of accrual date). Under the circumstances, it was reasonable for the plaintiffs to wait for Caterpillar to make a clear and unequivocal statement or to actually breach their labor contract. Indeed, Caterpillar made the decision in 2006 not to charge one group of retirees (surviving spouses) who received the same notice Caterpillar now claims repudiated its obligation to cover the costs of retiree health benefits, and Caterpillar contends that those retirees' claims for benefits are moot. (Stevens Aff. ¶ 34, Docket No. 76).

Taking all of the plaintiffs' allegations as true, and also considering evidence submitted by the parties in connection with the plaintiffs' pending motion for class certification, the court finds that the defendant has not shown that the plaintiffs' Section 301 LMRA or ERISA claims are time-barred.

40

F.     *The plaintiffs' allegations that Caterpillar failed to provide an adequate summary plan description state a claim.*

In Count V, the plaintiffs claim that Caterpillar violated their rights when the SPD failed to meet the minimum requirement's of ERISA's § 102, under which the SPD must specify "the plan's requirements respecting eligibility for participation and benefits; . . . *circumstances which may result in disqualification, ineligibility, or denial or loss of benefits . . . .*" 29 U.S.C. § 1022(b)  (Docket No. 61 ¶ 65)(emphasis in original).    In Count V the plaintiffs seek "appropriate equitable relief under ERISA § 502 (a)(3) and/or additional benefits under ERISA § 502(a)(1)(B)."  It is this request for relief with which the defendant takes issue in its motion to dismiss.

ERISA requires that every plan "shall be established and maintained pursuant to a written instrument." 29 U.S.C. § 1102(a)(1). In addition to this main plan document, ERISA mandates that the administrator of a plan shall create a written SPD and "shall furnish to each participant, and each beneficiary receiving under the plan, a copy of the summary plan description." 29 U.S.C. § 1024(b). An SPD must be "sufficiently accurate and comprehensive to reasonably apprise . . . participants and beneficiaries of their rights and obligations under the plan," and it must contain information regarding "circumstances which may result in disqualification, ineligibility, or denial or loss of benefits." 29 U.S.C. § 1022(a) and (b). SPD's "must not have the effect of misleading, misinforming, or failing to inform participants and beneficiaries." 29 C.F.R. § 2520.102-2(b); *Morrison v. Marsh & McLennan Companies, Inc.*, 326 F. Supp.2d 833, 839 (E.D. Mich. 2004).

41

Where a conflict exists such that the terms in an SPD directly contradict terms in a main plan document, the Sixth Circuit has held that "the summary shall govern." *Edwards v. State Farm Mut. Auto. Ins. Co.,* 851 F.2d 134, 136 (6th Cir. 1988); *see also Sprague v. Gen. Motors Corp.,* 133 F.3d 388, 401 (6th Cir. 1998). The underlying rationale of this rule rests upon a concern that the information contained in an SPD should be accurate and not misleading so that employees may reasonably rely on the information provided to them under ERISA.  The Sixth Circuit has explained that "it is the employer's duty to put employees on notice of their rights under the plan, and if they fail to adequately do so, they will be precluded from enforcing Plan language which conflicts with summary description language to the detriment of employees." *Helwig v. Kelsey-Hayes Co.,* 93 F.3d 243, 247 (6th Cir. 1996). This rule applies only where there is a conflict or ambiguity between terms in an SPD and terms in a main plan document. *Morrison v. Marsh & McLennan Companies, Inc*.,  326 F. Supp.2d 833, 840 (E.D. Mich. 2004).

The crux of Count V, according to the plaintiffs, is that, when Caterpillar made the December 1992 changes retroactive to the first of the year, it created such a scenario.  The plaintiffs allege that Caterpillar failed to issue a revised or new SPD[11],  and the change in the December 1992 announcement was inconsistent with the 1988 SPD, which still provided for lifetime, no-cost retiree health benefits.   Thus, urge the plaintiffs, because of the inconsistency between the  December announcement and the 1988 SPD, the SPD controls*.  See Edwards*, 851 F.2d at 136 ("statements in a summary plan are binding and if such statements conflict with those in the plan itself, the summary shall govern.").   The SPD is one of the documents

---

[11]The plaintiffs point out that they have requested discovery as to whether Caterpillar issued a revised or new SPD in conjunction with its 1992 changes to the plan.  (Docket No. 80 at 23 and n.14).

provided by Caterpillar under which the plaintiffs claim to have vested rights in lifetime, no-cost health insurance. It is under Count V that the plaintiffs seek to "preclude[] [Caterpillar] from enforcing Plan language which conflicts with summary description language to the detriment of employees." *Helwig,* 93 F.3d at 247.

The defendant is correct that the plaintiffs would not be entitled to recover substantive damages, even if the court found that the SPD's violated § 1022(a)(1), because violations of the procedural sections of ERISA do not give rise to claims for substantive damages. *See Lake v. Metro. Life Ins. Co.*, 73 F.3d 1372, 1378 (6th Cir. 1996); *Lewandowski v. Occidental Chem. Corp.*, 986 F.2d 1006, 1010 (6th Cir. 1993)(per curiam)(failure to provide a plan beneficiary with documents as required by §§ 1021-22 or 1024-25 does not give rise to a substantive remedy); *Community Ins. Co. v. Ohayon*, 73 F. Supp.2d 862, 868-69 (N.D. Ohio 1999)(a mere failure to comply with ERISA requirements will not support the recovery of money damages for breach of fiduciary duty). Therefore, to the extent that the plaintiffs' alternate request for "additional benefits under ERISA" is construed as a request for such substantive damages (i.e., money damages), that request is denied.

However, the plaintiffs state that they seek equitable relief, which they describe as the benefits "they were promised under the SPDs and Plans prior to Caterpillar's 1992 revisions." (Docket No. 80 at 22). The plaintiffs allege in their Amended Complaint that, because the 1988 SPD controls, plan participants could retire under the 1988 SPD, even after the labor agreements expired (those who retired after November 3, 1998 and before January 1, 1992). (Am. Compl. ¶¶ 32, 56). Thus, the plaintiffs ask the court "to craft an equitable remedy" under ERISA § 502(a)(3) "that would bar the effective date of the cap until 1999 when Caterpillar,

43

based upon new labor agreements, is believed to have revised the 1988 SPD to conform to the 1992 plan." (Docket No. 80 at 23-24).

"Participants can sue to enjoin an ERISA fiduciary from engaging in any act or practice that violates ERISA or the terms of the plan, or to obtain other appropriate equitable relief." *See* 29 U.S. § 1132(a)(3); *Ohayon*, 73 F. Supp.2d at 869 (holding that defendant failed to provide an adequate SPD and enjoining defendant from "further issuing policy certificates to beneficiaries . . . that fail to comply with ERISA requirements regarding summary plan descriptions."). Construing the allegations in the light most favorable to the plaintiffs, Count V states a claim for which equitable relief can be granted. However, depending on what the discovery process reveals and the manner in which the plaintiffs pursue and develop this claim, the court may revisit this determination at a later date. If Count V is meant to seek benefits pursuant to Section 502(a)(1)(B), it is duplicative of other counts in the Amended Complaint. Further, the plaintiffs may not recover substantive damages for Caterpillar's failure, even if proven, to follow ERISA procedures.

V.    Conclusion

For the reasons explained herein, the defendant's motion to dismiss (Docket No. 74) will be DENIED.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge

44