# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

GARY T. WINNETT, FREDA         )
JACKSON-CHITTUM, CASPER R.     )
HARRIS, WILLIAM H. DAILEY,     )
CALVIN E. GROGAN, KENNETH C.  )
HAMMER, and CHARLES A.       )
WATERFIELD, on behalf of themselves )
and others similarly situated,      )
                                )
          Plaintiffs,         )     **Case No. 3:06-cv-00235**
                                )     **District Judge Trauger**
v.                             )     **Magistrate Judge Brown**
                                )
CATERPILLAR, INC.,         )     **Class Action**
                                )
         Defendant/Third-Party Plaintiff,  )
                                )
v.                             )
                                )
INTERNATIONAL UNION, UAW, *et. al*,  )
                                )
         Third-Party Defendants.     )

## MEMORANDUM

Currently pending before the court is a Motion for Preliminary Injunction pursuant to Rule 65 of the Federal Rules of Civil Procedure filed by plaintiffs Gary T. Winnett, et al. and the subclass of retirees from Caterpillar Logistics Services ("CLS") division and surviving spouses of CLS retirees ("the CLS subclass"). (Docket No. 200). The plaintiffs allege that the subclass is entitled to a preliminary injunction because they have a vested right in no-cost retiree health care, and Caterpillar, Inc. ("Caterpillar" or "the Company") has not substantiated any of its affirmative defenses. Defendant Caterpillar has responded in opposition (Docket No. 240), and the plaintiffs have replied (Docket No. 253).

1

The court held a three-day evidentiary hearing on the plaintiff's motion, which is now ripe for decision. The parties also submitted post-hearing briefs (Docket Nos. 300, 301, 302, 303), which the court has considered.

## I.  FACTUAL FINDINGS[1]

The court finds the following facts:

**UAW-Caterpillar Bargaining Regarding Retiree Health Care Benefits**

In 1964, Caterpillar and the UAW first negotiated health care coverage for retirees. (Def.'s Ex. 23).[2]  According to UAW representatives James Atwood and Elliot Anderson, since then the retiree health care benefits have increased rather than decreased. (Tr. 37-38 Anderson, 163 Atwood). Both men testified that, although the UAW did not have authority to renegotiate vested benefits, it could negotiate increases to the pension and the medical benefits offered to current retirees. (Tr. 49-50 Anderson, 162-63 Atwood). For example, in 1988, the UAW and Caterpillar negotiated improvements in durable medical equipment, dental care, prescription drugs, speech therapy, and the amount of Medicare B co-pay. (Tr. 50 Anderson).  Anderson testified that, with each subsequent labor agreement, it was likely that their pension and medical benefits would be improved, just like the benefits of past retirees had been improved in previous contracts. (Tr. 49-50).

---

[1]The court presumes the reader's familiarity with the Caterpillar-UAW bargaining relationship and the general background of this case, as set forth in the court's prior Memorandum entered on May 16, 2007. (Docket No. 120 at 4-14).

[2]The court's citations to "Pls.' Ex." and "Def.'s Ex." refer to exhibits received into evidence during the July 2008 evidentiary hearing in this matter.  Citations to "Tr." refer to the official transcript of the evidentiary hearing.  The name of the testifying witness follows the court's citation to the transcript page number, unless the witness is unambiguously identified in the preceding sentence. The full transcript appears at Docket Nos. 297-299.

2

Caterpillar only identified one negotiated decrease to the retiree health care benefit: an increase in prescription drug co-pays in 1983. (Tr. 337-38 Broadbear). Gene Broadbear, who was in charge of negotiating on behalf of Caterpillar at that time, characterized the increase as a "modification," not a reduction. He testified that the amount was under $5 and relatively minor. (*Id*.) The UAW's Atwood put it a different way: "[A]ny reductions that we ever negotiated for retirees were offset by improvements to those retirees." (Tr. 163). He went on to explain that:

> Well, for example, if the prescription drug co-pay was $2 and was increased to $3, if you go back and check, you'll find that, for example, in that same round of bargaining, the right to a 90 day supply of drugs instead of the $2, 30 day co-pay, you could get a mail order three month script for the same drugs for one co-pay.
>      So . . . it was an improvement to the drug program, for example. But if you just looked at it on its face and said,well, it was $2 and you raised it to 3, that's certainly not a fair analysis of what happened.

(Tr. 163).

The retiree health care benefit was not set forth in the Central Labor Agreement ("CLA"), but in separate bargained-for agreements: the Insurance Plan Agreement ("IPA") and the attached Group Insurance Plan ("GIP"). (Pls.' Ex. 16). For twenty years, the language in Paragraph 5.15 of each year's GIP has remained largely intact. (Pls.' Ex. 2 and 4). The instant plaintiffs claim vested "no cost" retiree health care benefits under the 1988 GIP, which provided health care benefits for retirees and surviving spouses as follows:

> 5.15. Retirement Medical Insurance. Retired Employees who satisfy the requirements hereinafter set forth shall be entitled to the same benefits provided in this Section V as if they were Employees. Coverage in accordance with this paragraph 5.15 shall be provided without cost to any such retired Employee. Such benefits to the extent provided in this paragraph 5.15 will be provided after his retirement from active service for a retired Employee if he has at least 5 years of credited service under

3

the Non-Contributory Pension Plan at his retirement and is eligible
for the immediate commencement of a monthly pension under the
Non-Contributory Pension Plan or would be eligible for such
immediate commencement but for his election to defer
commencement of his pension. Coverage shall take effect on his
retirement date…

\* \* \*

Dependents' Coverage shall be in effect in accordance with this
paragraph 5.15 while Personal Coverage is in effect with respect to
(a) all Dependents of a retired Employee who were covered
hereunder on the day preceding his retirement and (b) any person
who becomes a Dependent after the retirement of a retired
Employee if such retired Employee either was covered for
Dependents' Coverage prior to retirement or had no Dependents
prior to retirement, and such Dependents' Coverage will be
continued following the death of a retired Employee for the
remainder of his surviving spouse's life without cost. For purposes
of this paragraph 5.15 only, the terms "Employee" and
"Employee's", wherever appearing in other sections hereof, shall
be deemed to read "retired Employee" and "retired Employee's",
respectively.

(Pls.' Ex. 16).

**Caterpillar and the UAW Agree to the CLS Agreement**

In 1987, Caterpillar formed a subsidiary, Caterpillar Logistics Services, Inc., to

market the Company's global warehousing and product distribution expertise to third-party

customers.  (Tr. 323 Broadbear).  In order to supply its own manufacturing facilities, as well as

its worldwide network of dealers and customers, Caterpillar had established a world-class

warehousing and parts distribution operation.  (Docket No. 244, Broadbear Decl.  ¶ 10; Tr. 323

Broadbear) .  CLS was designed to offer this recognized expertise to third-parties seeking such

services.  (Broadbear Decl.  ¶ 11).  One possible impediment to marketing this business,

however, was that much of Caterpillar's domestic parts distribution network was located in

4

UAW-represented facilities. (Tr. 324 Broadbear). For example, within the Central Labor Agreement facilities, Caterpillar operated four UAW-represented parts facilities: Morton, Illinois; Denver, Colorado; York, Pennsylvania; and Memphis, Tennessee. (Broadbear Decl. ¶ 12). Under the CLS marketing plan, these facilities would handle third party distribution work, in addition to their existing Caterpillar parts distribution work. (*Id.* ¶ 13). Caterpillar was concerned that third-parties would be reluctant to place their product in facilities that might be subject to UAW strikes unrelated to their businesses. (*Id.*; Pls.' Ex. 8) In 1987-88, Caterpillar engaged the UAW in discussions about the establishment of an agreement to address this concern. (*Id.* ¶ 14).

The 1988 CLA expired for non-CLS employees on October 31, 1991. (Pls.' Ex. 15). As to those non-CLS employees, Caterpillar and the UAW agreed to extend the 1988 CLA until November 4, 1991, at which time the UAW went on strike. (Tr. 96-97 Atwood). At CLS locations, the 1988 CLA and benefits agreements did not expire and there was no strike. (*Id.*)

Caterpillar and the UAW extended the 1988 for CLS workers by an agreement called the CLS Agreement, executed in May 1988. (Pls.' Ex. 1; Tr. 95 Atwood). Under the CLS Agreement, the UAW guaranteed Caterpillar that certain parts system services to third parties would not be interrupted in the event of a strike. (Tr. 27-28, 94 Anderson). In exchange for the no-strike clause, the UAW hoped that the agreement would bring new jobs and maintain plants on the brink of closing. (Tr. 29, 94 Anderson). The UAW negotiated that, in the event of a strike, the 1988 CLA would remain in effect for CLS employees past its expiration date and until the ratification of a successor agreement for CLS employees. (Tr. 95 Atwood). Section 5(a) of the CLS Agreement states:

5

> Upon expiration by its terms of a Labor Agreement between the parties applicable, in whole or in part, to Covered Employees, such Labor Agreement shall not be deemed to have expired but shall be deemed to continue in full force and effect in so far as it relates or applies to Covered Employees.
>
> Upon completion of the negotiations for and ratification of a new Central Labor Agreement and all other Local Labor Agreements between the parties, all terms of the new Central Labor Agreement, except as modified by or superseded by the terms of this Agreement, shall become automatically applicable to such Covered Employees.

(Pls.' Ex. 1 § 5). Section 1(c) of the CLS Agreement defines "Covered Employees" as "any employees within units covered by the Central Labor Agreement and who are engaged in work involving Caterpillar parts distribution or CLS work." (*Id.* § 1).

Elliot Anderson, the UAW representative for the CLS Agreement negotiations, testified that Section 5(a) of the CLS Agreement applied to "active employees, not for retirees . . . because it talks about the terms of employment and retiree is [sic] not employed." (Tr. 52-53, 56). James Atwood, who enforced the CLS Agreement for the UAW once Anderson retired, testified that the definition of "Covered Employees" did not include retirees because "it's covered employees who are engaged in work . . . and that's only seniority employees, and the retirees are not seniority employees." (Tr. 97-98). He then explained that retirees do not maintain their place on seniority lists. (*Id.*)

During the negotiations for the CLS Agreement, the UAW and Caterpillar did not discuss how the CLS Agreement would apply to retirees. Anderson testified at the hearing that retirees were not discussed at all. (Tr. 36). Gene Broadbear, the Caterpillar representative during the negotiations, had no recollection of discussing with the UAW how the CLS Agreement would apply to covered employees who retired from a CLS facility. (Tr. 335-36).

6

Because the CLS Agreement modified the CLA, UAW leadership felt that the CLS Agreement needed to be ratified by the full union membership. (Tr. 31 Anderson). During the ratification process, the UAW educated its membership about the CLS Agreement and assured membership that their "coverage" would remain the same. (Tr. 54-57 Anderson; 335-36 Broadbear). A pamphlet describing the new agreement, prepared by the UAW before ratification, told the membership: "There would be no changes in wages, pensions, health care and all other economic provisions, and no changes in noneconomic provisions . . . other than those outlined." (Pls.' Ex. 8). Similarly, Broadbear told the UAW's Randy Arrington in correspondence that the CLS Agreement was a "win-win situation" for the company and the union, in part because employees could enter the agreement "without employees losing any seniority related or contractual rights." (Tr. 336-37; Def.'s Ex. 9). Likewise, Anderson testified that "what we negotiated in the CLS [Agreement] did not reduce any benefits." (Tr. 57).

The CLS Agreement specifically included "Benefit Plan Agreements" as part of the agreements that were to be extended until the signing of a new labor agreement. (Pls.' Ex. 1, CLS Agreement § 1(e)). During the labor dispute, which lasted from 1991 to 1998, the CLS employees and the CLS subclass (who retired during the strike) received benefits under the 1988 Benefit Plan Agreements. (Tr. 411-12 Brust). Specifically, their pay, their working conditions, and their medical benefits all came from the 1988 contract. (Tr. 109 Atwood). For those who retired during the extension of the 1988 agreement, they also received retirement benefits under the 1988 agreement, including a $1600 pension. (Tr. 110 Atwood).

**The 1991-98 Caterpillar-UAW Negotiations**

While the CLS employees continued to work under the extension of the 1988 contract, the UAW and Caterpillar negotiated a new contract. Early in the negotiations, in 1991, Caterpillar proposed but did not implement a cap on its contribution to retiree medical costs, with the remainder to be paid by the retiree, effective January 1, 1996. (Tr. 105 Atwood). Caterpillar's initial proposal also contained changes to medical coverage for all existing and future retirees. (Docket No. 247, Stevens Decl. ¶ 10, Ex. 1). These changes included: (a) cost-sharing in the form of monthly premiums; (b) the establishment of a preferred provider network, whereby employees and retirees could receive fully-paid services from in-network providers, but would be required to bear 30 percent of the cost of any services received from out-of-network providers; (c) a cap on the Company's level of contribution for future retiree medical costs; (d) a change to the retiree eligibility formula; (e) an elimination of the ability to add new dependents after retirement; and (d) various proposed changes to dental and vision coverage, which were also included in the applicable Group Insurance Plan. (*Id.* ¶ 10, Ex. 1 at 1-2).

In describing why Caterpillar announced potential changes to benefits in 1991, Caterpillar's Jerry Brust claimed that "we wanted to give employees an opportunity – if they were contemplating retiring in the near future . . . to make the decision whether they were going to in effect, cash in their chips and push back from the table prior to January of '92 and retire knowing that they had locked in at that point . . . ." (Tr. 373).

On September 1, 1992, Caterpillar proposed a new potential cap: "The date after which retirees may be required to make additional contributions toward the costs of their medical benefits if those costs exceed a specified level of cost has been postponed from January 1, 1996

8

to January 1, 2000." (Tr. 105-06 Atwood; Pls.' Ex. 30)). On November 19, 1992, Caterpillar directed its managers to distribute to all active employees a flyer entitled "Retiree health care," which stated that the cap may never come into effect:

> Cat has deferred the cap until the year 2000, and a lot can happen by then. As the health care crisis gets more attention, it becomes more likely that some national solutions will be found. By the time the cap is activated, the United States might have a national health care program which could eliminate the need for premiums.

(Pls.' Ex. 31). By March 1, 1998, Caterpillar again changed the date the potential cap would come into effect after Caterpillar and the UAW created a Voluntary Employee Beneficiary Association ("VEBA") Trust account to cover any costs to the retiree. (Tr. 130 Atwood; Pls.' Ex. 46). The UAW's summary described the proposal:

> [A]pproximately $32.3 million, are to be placed in an interest-bearing Voluntary Employee Beneficiary Association (VEBA) Trust to cover the cost of retiree health care that exceeds the retiree health care cap . . . . The money in the trust would be used to pay retiree health care premiums that exceed the cap until the last dollar is exhausted. Under current projections, the amount in the Trust is anticipated to be sufficient to pay any premiums exceeding the cap through the term of the agreement.

(Pls.' Ex. 46). The "Benefit Changes" sheet prepared by Caterpillar, also dated March 1998 and directed to UAW retirees at Morton and Memphis, said that "[r]etirees may be required to pay a monthly premium for coverage after the trust is depleted." (Pls.' Ex. 47).

The 1999 SPD described the VEBA in this way: "If costs rise above that amount, beginning January 1, 2000, retirees will be required contribute [sic] towards the cost of health care benefits in the form of a monthly premium." (Pls.' Ex. 60 at 50).

Throughout the 1991-98 negotiations, employees and retirees were inundated with communications from Caterpillar and the UAW describing the progress of collective bargaining

9

negotiations and the parties' respective contract proposals. (Tr. 524-34 Stevens; Def.'s Ex. 65). Plaintiff Winnett testified that he was aware of Caterpillar's proposals and the implemented terms at this time. (Tr. 510-14). He testified that he understood the VEBA would only continue to pay retirees' health care premiums so long as there was money in the VEBA to do so. (Tr. 515).

During the labor conflict, Caterpillar also sent out information concerning the implementation of a health care network. When the Network was first proposed, Caterpillar described the Network as providing "Full" coverage. (Def.'s Ex. 65 at C020091). In one of its first descriptions of the Network, Caterpillar stated: "For employees who receive services in a network, the company would provide health-care benefits as under the current contract, with no deductibles or co-payments." (*Id.*)(emphasis in original). The summary also stated that, "if the company does not have a network in an area where the employee lives, the company would continue to provide benefits as under the current contract." (*Id.*) The chart in this summary indicated that if a participant were in network and had an emergency which resulted in going to an out of network provider, he or she would be exempt from any co-pay. (*Id.*) A later chart, dated November 21, 1991, described the benefits under the network as "Full payment." (Def.'s Ex. 65 at C020181). It also stressed several advantages to the Network, including "*NO* co-pays or deductibles." (*Id.*)(emphasis in original).

Once the Network took effect, Caterpillar continued to inform retirees living within the Network service areas that covered medical expenses would be "payable in full" and "100%" for covered expenses at any Network hospital or physician. (Pls.' Ex. 60 at P01136-37). William Dailey testified that he was aware of the imposition of the Network in 1998. (Tr. 275).

10

Today, the pre-1992 retirees, who are also subject to the Network, are still eligible to receive full coverage anywhere in the country. (Pls.' Exs. 48, 60 at P01136-41; Tr. 553). While covered benefits could result in costs if the participant elects to go outside the Network, there are exceptions for life threatening emergencies and travel/vacation situations which cause someone to use an out-of-network provider. (Pls.' Ex. 60 at P01136, P01138).

**Caterpillar's 1992 Unilateral Implementation**

On November 3, 1991, the UAW canceled a previously-negotiated extension, terminated the 1988 labor contract, and commenced a selective strike. (Docket No. 76, Stevens Aff. ¶ 18). After negotiations failed to produce an agreement, Caterpillar advised the UAW that it believed the parties' negotiations were at a legal impasse. (*Id.* ¶ 20). Caterpillar then advised the UAW and its members that, effective April 6, 1992, it would unilaterally implement portions of its final offer. (*Id.* ¶ 20, Exs. 9-10).

In response, the UAW expanded its work stoppage and filed an unfair labor practice charge with the NLRB, but the charge was found to be without merit. (*Id.* ¶ 21). Caterpillar then proceeded with its implementation. In March 1992, Caterpillar sent out announcements about the terms it planned to implement at striking facilities. (Pls.' Ex. 28, Tr. 108-09 Atwood). Caterpillar also sent those announcements to the CLS facilities, but attached a letter to CLS workers stating: "The contents of this attachment do not apply to you . . . . The second attachment describes new terms and conditions of employment that will be implemented April 6, 1992 for parts and service employees at York in Denver. Again, these terms do not apply to you." (*Id.*) The parties continued to negotiate, but could not reach agreement. (Docket No. 76,

11

Stevens Aff. ¶ 23). In December 1992, Caterpillar unilaterally implemented additional parts of its final offer, including the retiree medical caps. (*Id*. ¶ 24, Ex. 11).

In a letter dated May 11, 1993, Caterpillar Director of Corporate Labor Relations, Jerry Brust, wrote to the UAW concerning Morton and Memphis employees who had worked under the CLS agreement and retired prior to October 1, 1988: "As far as Caterpillar is concerned, the UAW does not legally represent individuals once they have retired. See Allied Chemical and Alkali Workers v. Pittsburgh Plate Glass Co., 404 U.S. 157 (1971)." (Docket No. 202, Ex. 7)(emphasis in original).

During the labor conflict, the UAW rejected Caterpillar's repeated offers to give the CLS subclass benefits under implemented terms, which included a pension increase to $1800 per month, rather than under the 1988 agreement, which only provided $1600 per month. (Tr. 113-17 Atwood; Pls.' Exs. 39, 40). The UAW rejected this offer because the company was insisting that the pension increase was contingent on acceptance of the proposed health care cap and other terms that the union opposed at the bargaining table. (Tr. 113-17 Atwood; Pls.' Exs. 38, 39). The UAW's position was that CLS workers who retired during the extension of the 1988 agreement should receive the benefits of the 1988 agreement, which included no-cost retiree health care, even if it resulted in the lower pension amount. (Tr. 115-17, Atwood; Pls.' Ex. 40).

It is undisputed that, during the labor dispute, CLS workers, working under the extension of the 1988 agreement, were never subject to Caterpillar's implemented terms. (Tr. 110 Atwood).

**Caterpillar and the UAW Agree to Successor Labor Contract in 1998**

12

The labor conflict ultimately was resolved on March 16, 1998, with the ratification of a new CLA. The class period ends with that ratification. (Class Cert. Order, Docket No. 140). All of the CLS subclass retired prior to the execution of the 1998 contracts. (Docket No. 201 at 4).

**Application of the 1998 CLA to CLS Retirees**

Following the 1998 settlement, Caterpillar and the UAW addressed how they would apply those terms to CLS retirees. Brust had considered this issue in 1992 following the Company's first unilateral implementation. (Tr. 378-79 Brust; Docket No. 246, Brust Decl. ¶¶ 17-22). Brust received input from Caterpillar's Director of Compensation and Benefits, Jerry Kenney, who opined that the CLS Agreement was ambiguous as to its application to individuals who retired from CLS facilities. (Tr. 378-79 Brust; Docket No. 246, Brust Decl. ¶ 20). Brust concluded that the correct interpretation was that CLS retirees would "automatically" receive any new or enhanced terms when Caterpillar and the UAW reached agreement on a new labor contract. (Tr. 379 Brust; Docket No. 246, Brust Decl. ¶¶ 21-22).

After the 1998 CLA was ratified, Brust and Atwood corresponded concerning whether and when provisions of the new CLA would apply to the CLS subclass. (Tr. 134-38 Atwood; Tr. 380-83 Brust; Def.'s Ex. 43). Following a series of primarily written communications between Brust and Atwood, the network provisions and retiree medical caps were applied to the CLS subclass beginning in April and June of 1998. (Docket No. 246, Brust Decl. ¶ 39).

The Company prepared "Benefit Changes" announcements, which summarized many of the key changes to active employees' and retirees' medical benefits under the new contracts. (Docket No. 241, Meeker Decl. ¶¶ 6-7, Ex. 1; Tr. 454-48 Meeker; Def.'s Exs. 45-46). Specific

13

announcements were prepared for and sent to all affected populations, including the CLS subclass.  (*Id*.)  These announcements advised CLS subclass members of various changes to their retiree medical benefits.   (*Id*.)  Specifically, the announcement stated that CLS retirees were covered by Caterpillar's health care network if they were under 65 as of June 1998, would pay higher prescription drug co-pays, effective May 1998 and April 2002, were limited in whom they could add as a new dependent and were required to pay the full cost of any such dependents, and would be covered by the retiree medical caps.  (*Id*.)

The summary also outlined several new cost obligations for CLS retirees with respect to their vision and dental coverages, as well as various enhancements in coverages for dental, vision, medical and pension benefits.  (*Id*.) The summary also advised CLS retirees that additional details would "be included in the benefit booklet that you will receive at a later date." A Summary Plan Description was issued in November 1999, and copies were sent to all CLS retirees before the end of 1999. (Def.'s Ex. 47; Docket No. 241, Meeker Decl. ¶¶ 6-8, Ex. 2).  Like the 1998 summary provided to CLS retirees, the 1999 SPD outlined, albeit in greater detail, the various changes and enhancements to CLS retirees' medical, dental, vision and pension benefits.  (*Id*.)

During the course of the 1998 agreement, employees and retirees were informed by Caterpillar and the UAW that they would have no costs associated with their health care because VEBA would continue through the end of the 1998 agreement in 2004.  (Pls.' Exs. 62, 63, 65, 66).  These assurances proved true.  (Tr. 129 Atwood).

**Caterpillar and the UAW Agree to the 2004 Labor Contract**

By the time the 1998 labor contract was near expiration, the VEBA fund was almost completely depleted. (Docket No. 76, Stevens Aff. ¶ 32). Caterpillar and the UAW commenced negotiations over successor labor contracts and eventually agreed upon terms of successor labor contracts in 2004. (*Id.* ¶ 33). As is relevant here, Caterpillar and the UAW agreed that rather than having retirees pay 100 percent of the costs above the caps, the Company would share in the "above the cap" costs on a 40/60 basis. (*Id.*) Under the 2004 labor contract, all retirees, including CLS retirees, received additional economic enhancements to their medical and pension benefits. (Docket No. 242, Decroix Decl. ¶ 9).

Beginning in 2004, Caterpillar began deducting a monthly premium for health care from the pensions of the CLS subclass members. (Docket No. 202, Dailey Decl. ¶ 6; Shawgo Decl. ¶ 6; Church Decl. ¶ 9). Beginning in 2006, the CLS subclass members have been charged deductibles, out-of-pocket charges, and co-insurance charges. (Docket No. 202, Dailey Decl ¶¶ 10, 11; Shawgo Decl. ¶ 6; Church Decl. ¶ 11, 12; Hunter Decl. ¶ 13). There are approximately 274 members of this subclass of CLS retirees and their surviving spouses. (Docket No. 201 at 5 & n.1). Of those 274 members, 230 are retirees who retired from a CLS facility and 44 are surviving spouses of CLS retirees. (Docket No. 203, Romer Decl. ¶¶ 3-4).

**Plaintiffs Initiate and Pursue Legal Action Against Caterpillar**

Plaintiffs filed this action on March 28, 2006. (Docket No. 1). The court denied Caterpillar's Motion to Dismiss on May 16, 2007. (Docket No. 121). Relying on the Sixth Circuit's decision in *UAW v. Yard-Man*, 716 F.2d 1476, 1479-80 (6th Cir.1983), as well as other cases, the court held that, "in interpreting the language of the relevant documents, the court finds

evidence that Caterpillar intended to confer lifetime vested retiree medical benefits upon the plaintiffs. In addition, looking to the larger context in which the agreement exists, the court finds that extrinsic evidence supports its determination that the parties intended the retirement benefits to survive the expiration of the CBA." (Docket No. 120 at 27). The court went on to hold that, based on the governing contracts, vesting could occur either (1) upon actual retirement (so long as the employee was eligible for the receipt of a pension and had at least five years of credited service, as set forth in ¶ 5.15 of the 1988 GIP), or (2) upon attaining retirement eligibility (meeting the same requirements). (*Id.* at 27-31). To conclude otherwise, found the court, would render any promise of future retiree benefits illusory. (Docket No. 120 at 30-31).

The court also held that language Caterpillar cited as a reservation of rights in a Summary Plan Description (SPD) was "qualified by reference to the applicable collective bargaining agreements [and] the reservation does not excuse the company from its contractual obligations." (Docket No. 120 at 26-27) (*citing Yolton v. El Paso Tenn. Pipeline Co.*, 435 F.3d 571, 582 (6th Cir. 2006); *McCoy v. Meridian Auto Sys., Inc.*, 390 F.3d 417, 424 (6th Cir. 2004)).

On July 12, 2007, the court granted plaintiffs' Motion to Certify the class and subclasses. (Docket No. 140). The main class was defined as retirees (or surviving spouses of such retirees) who are or were participating in Caterpillar's plan providing the retiree health benefit, who were represented by the UAW at the time of their retirement, who began working prior to the expiration of the 1988 labor agreement and retired on or after January 1, 1992 and before March 16, 1998, and who were pension eligible at retirement. (*Id.* at 1). The CLS subclass, certified as one of three subclasses, was defined as "members of the main class who worked (or whose employee spouse worked) under the CLS Agreement." (*Id.* at 2).

16

After certifying the class, the court granted Caterpillar's Motion to Certify an Interlocutory Appeal of the court's ruling on the Motion to Dismiss. The court granted certification of the appeal on "the basis that the interrelated issues of subject matter jurisdiction and vesting of benefits present controlling questions of law about which there is substantial ground for difference of opinion." (Docket No. 142). The court noted that "Caterpillar has conceded that the court would retain jurisdiction over the claims of CLS retirees and surviving spouses." (Docket No. 141 at 11)(citing Docket No. 129 at 8.) The Sixth Circuit has accepted the interlocutory appeal. The parties agree that arguments concerning the CLS subclass are not at issue in the interlocutory appeal. (Docket No. 201 at 1; Docket No. 139 at 11-12).

The plaintiffs maintain that the accruing and increasing charges are causing the subclass members irreparable harm; therefore, the plaintiffs seek a preliminary injunction on behalf of the CLS subclass. The plaintiffs, on behalf of the CLS subclass, seek an order enjoining Caterpillar from continuing to charge premiums to maintain their health insurance and enjoining Caterpillar from making changes to the CLS subclass that are inconsistent with the benefits currently provided to the Caterpillar retirees who retired prior to 1992. The pre-1992 retirees currently enjoy premium-free, no-cost retiree health care under the 1998 SPD. (*See* Docket No. 254, Mulder Decl., Ex. 19 at C052067-052608). Therefore, the plaintiffs ask the court to enjoin Caterpillar from charging the CLS subclass the following specific charges, which are not part of the 1998 plan: premiums to maintain their health care benefit (Tr. 547 Stevens); deductibles of $300 (individual) or $600 (family) before the health insurance applies (Tr. 547 Stevens); the retiree's share of a 90/10 split and maximum out-of-pocket payments, which require the CLS subclass to pay 10% of the costs of their post-deductible health care until the amount reaches the

17

out-of-pocket maximums of $750 (individual) or $1500 (family) (Tr. 548-49 Stevens); and individual and family deductibles for dental services and new costs for their vision plan (Pls.' Ex. 76).

The plaintiffs do not seek relief from charges for office visits for primary care or for the care of a specialist because these charges have always been assessed to all employees and retirees, including pre-1992 retirees. (Tr. 549 Stevens). In addition, because the plaintiffs concede that the 1999 SPD makes clear that the Network applies to the pre-1992 retirees (Pls.' Ex. 60, P01136-41), the plaintiffs do not seek relief from charges associated with the Caterpillar Health Care Network under the 1998 SPDs (Docket No. 300 at 16).

## II.    PRELIMINARY INJUNCTION STANDARD

In deciding whether to issue a preliminary injunction, the court must consider the following factors: "(1) the likelihood that the party seeking the preliminary injunction will succeed on the merits of the claim; (2) whether the party seeking the injunction will suffer irreparable harm without the grant of the extraordinary relief; (3) the probability that granting the injunction will cause substantial harm to others; and (4) whether the public interest is advanced by the issuance of the injunction." *United States v. Edward Rose & Sons*, 384 F.3d 258, 261 (6th Cir. 2004) (quoting *Washington v. Reno*, 35 F.3d 1093, 1099 (6th Cir. 1994)). These are factors to be balanced, not prerequisites that must be met. *Id.* No single factor will be determinative as to the appropriateness of the equitable relief sought. *In re DeLorean Motor Co.*, 755 F.2d 1223, 1229 (6th Cir. 1985).

The purpose of a preliminary injunction is simply to preserve the status quo; thus, findings of fact and conclusions of law made by a district court in granting a preliminary

injunction are not binding at a trial on the merits. *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395, 101 S. Ct. 1830, 68 L.Ed.2d 175 (1981). Under Rule 52 of the Federal Rules of Civil Procedure, a district court is required "to make specific findings concerning each of these four factors, unless fewer are dispositive of the issue." *DeLorean Motor Co.*, 755 F.2d at 1228.

The proof required to obtain a preliminary injunction "is much more stringent than . . . proof required to survive a summary judgment motion." *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000). "[T]he preliminary injunction is an 'extraordinary remedy . . . which is to be applied only in limited circumstances which clearly demand it.'" *Id.* Therefore, the court's previous findings cannot simply be readopted wholesale and must be evaluated in light of the additional evidence that has been adduced and the heightened legal standard applicable to the plaintiffs' request for extraordinary injunctive relief.

### A.     Likelihood of Success on the Merits

To succeed on the merits of their claim, the CLS subclass must show that the CLS Agreement extended the 1988 CLA beyond its expiration for the CLS subclass such that they retired under that contract and that the 1988 GIP provided a vested right to lifetime no-cost retiree benefits.[3] The court finds that the CLS subclass has shown a likelihood of success with respect to both components of their claim.

---

[3]The CLS subclass members share claims with the entire class that their rights vested earlier than at the date of their retirement. Those claims, however, need not be addressed herein because the Motion for Preliminary Injunction is based on the independent claim that the CLS subclass retired under the 1988 CLA because of the CLS Agreement's extension.

1. **The CLS Agreement extended the 1988 labor contract beyond its expiration for the CLS subclass such that they retired under that contract.**

The CLS Agreement is a labor contract. "The enforcement and interpretation of collective bargaining agreements under § 301 [of the LMRA] is governed by substantive federal law. However, traditional rules for contractual interpretation are applied as long as their application is consistent with federal labor law policies." *Int'l Union, UAW v. Yard-Man, Inc.*, 716 F.2d 1476, 1479-80 (6th Cir. 1983)("*Yard-Man*"). Courts "should first look to the explicit language of the collective bargaining agreement for clear manifestations of intent. The intended meaning of even the most explicit language can, of course, only be understood in light of the context which gave rise to its inclusion." *Yard-Man,* 716 F.2d at 1479. Courts "should also interpret each provision in question as part of the integrated whole. If possible, each provision should be construed consistently with the entire document and the relative positions and purposes of the parties." *Id.* As in all contracts, the collective bargaining agreement's terms must be construed so as to render none nugatory and to avoid illusory promises. *Id.* at 1479-80.

When ambiguities exist, courts may look to other words and phrases of the document and other extrinsic evidence. *Id.* at 1480; *see also Golden v. Kelsey-Hayes,* 73 F.3d 648, 654 (6th Cir. 1996); *UAW v. BVR Liquidating, Inc.*, 190 F.3d 768, 774 (6th Cir. 1999)(extrinsic evidence is admissible to determine an intent to vest benefits when the language of the collective bargaining agreement is ambiguous). The court should review the interpretation ultimately derived from its examination of the language, context, and other indicia of intent for consistency with federal labor policy. *Yard-Man*, 716 F.2d at 1479-80. With these principles in mind, the court considers

20

whether the CLS Agreement extended the 1988 labor contract beyond its expiration for the CLS

subclass such that they retired under that contract.

**Express Language of the CLS Agreement and Its Context**

The CLS Agreement contains the following provisions most relevant to the current

dispute:

> Section 1.  <u>Definitions</u>
>
> * * *
>
> (c)  "Covered Employees" means any employees within
> units covered by the Central Labor Agreement who are engaged in
> work involving or related to Caterpillar Parts Distribution or
> Caterpillar Logistics Services Work.

(Pls.' Ex. 1 § 1(c)).

> Section 5.  <u>Extension of Labor Agreement and Negotiation of New Terms of
> Employment</u>.
>
> (a)  Upon expiration by its terms of a Labor Agreement between the parties
> applicable, in whole or in part, to Covered Employees, such Labor Agreement
> shall not be deemed to have expired but shall be deemed to continue in full force
> and effect in so far as it relates or applies to Covered Employees.
>
> Upon completion of the negotiations for and ratification of a new Central
> Labor Agreement and all other Local Labor Agreements between the parties, all
> terms of the new Central Labor Agreement, except as modified by or superseded
> by the terms of this Agreement, shall become automatically applicable to such
> Covered Employees.

(Pls.' Ex. 1 § 5).  It is undisputed that the "Labor Agreement" referred to in Section 5 of the CLS

Agreement included benefit plan agreements, which lay out the negotiated retirement benefits for

UAW retirees.  (Pls.' Ex. 1, CLS Agreement § 1(e)).

The parties advance competing interpretations of Section 5 of the CLS Agreement. The plaintiffs' and Caterpillar's interpretations diverge in the reading of the second paragraph of Section 5 of the CLS Agreement. Caterpillar, relying on the sentence "all terms of the new Central Labor Agreement … shall become automatically applicable to such Covered Employees", argues that once the labor dispute was resolved and the next contract became effective, the new contract applied both to the active and retired workers. Thus, Caterpillar argues, the 1998 benefit plan automatically applied to CLS workers who were already retired and receiving benefits under the 1988 plan. (Docket No. 301 at 3-5; Tr. 304).

Caterpillar's alternate construction is that the CLS Agreement only provided rights to "Covered Employees," and if CLS retirees were not "Covered Employees," they were subject to the 1992 implementation terms. (*Id.* at 4).

The plaintiffs advance a different theory altogether. They allege that the 1988 labor agreement, which included the 1988 CLA and benefits agreements, continued to be in "full force and effect" for "Covered Employees" who, by definition, were actively engaged in CLS work. As the "Covered Employees" retired, they gained their vested rights under the 1988 CLA. All of the members of the CLS subclass had retired by the date of the execution of the 1998 CLA. Thus, as retirees, they were no longer "Covered Employees" according to the definition within the agreement, and the new CLA was not automatically applicable to them. When the new 1998 CLA became active, it "automatically applied" to active employees: those who were at that time engaged in work at CLS facilities. (Docket No. 300 at 4-6).

First, the court finds that Section 1(e) of the CLS Agreement unambiguously defines "Covered Employees" as those employees, at any given time, who are actively working within

22

units covered by the CLS Agreement and who are performing work involving or related to Caterpillar parts distribution or CLS work.  The definition does not include retirees.   The explicit language of the Agreement itself supports this reading.   "Covered Employees" are defined as those employees who "*are* engaged" in work.  In its submissions to the court, Caterpillar continues to cite this provision inaccurately.  (Docket Nos. 240 at 5 n.3; 301 at 2)(misquoting Section 1(c) as defining "Covered Employees" as those who *were* engaged in work).   The Agreement does not use the past tense form of the verb; thus it expressly excludes those workers no longer assigned to CLS units or engaged in CLS work.   Those employees who previously worked in CLS facilities and retired before the new contract was ratified therefore do not fall within this definition.

When Caterpillar and the UAW wanted the term "employee" to include retirees, they knew how to craft contract language to include them in the definition.  For example, the 1988 GIP in Paragraph 5.15 concludes by stating: "For purposes of this paragraph 5.15 only, the terms 'Employee' and 'Employee's', wherever appearing in the other sections hereof, shall be deemed to read 'retired Employee' and 'retired Employee's', respectively."   (Pls.' Ex. 16; Tr. 98-100 Atwood).  No such language is found in the CLS Agreement.

Section 3 of the Agreement assures that "Covered Employees" will not participate in strikes or other work stoppages.   Retirees cannot strike or participate in a work stoppage.  Section 4 of the Agreement assures that the union and its members will not establish or maintain picket lines.  Typically, active workers, not retirees, establish and maintain picket lines.  Section 5 is entitled "New Terms of Employment."  Terms of employment apply only to active workers, not retirees.   The Agreement is automatically renewable into perpetuity and applies to all

23

subsequent collective bargaining agreements. These provisions also suggest that only active workers are "Covered Employees."

Keeping in mind this understanding of who "Covered Employees" are, the court finds that Section 5 of the CLS Agreement is likewise unambiguous. *See Yard-Man,* 716 F.2d at 1479 (courts "should also interpret each provision in question as part of the integrated whole. If possible, each provision should be construed consistently with the entire document . . . ."). Section 5 provides that any employee who continues to work under the CLS Agreement's extension of the 1988 CLA would be automatically covered by the terms of the new CBA when it was ratified because, at the time of ratification, he or she would be a "Covered Employee" subject to Section 5(a)'s "automatically applicable" provision. In contrast, any worker who retired before the new CLA went into effect was not covered by Section 5(a)'s "automatically applicable" provision; he or she was no longer a "Covered Employee" actively engaged in CLS work. The 1988 CLA, which was the source of all benefits for those working under the CLS Agreement, would continue in "full force and effect" for those retirees.

The CLS Agreement itself identifies its purposes as "to induce and encourage the Company to place such logistics service work in Company parts distribution facilities employing UAW Union-represented personnel" and "to provide a labor climate and labor agreement between the parties that will assure both the Company and third-party manufacturers and others who are potential customers of such logistics services that the Company's parts distribution and other logistics services operations will not be subject to work stoppages or other labor disruptions of any kind or for any reason . . . ." (Pls.' Ex. 1, CLS Agreement, preamble). Thus, the purpose of the CLS Agreement was not to induce active workers in 1988 to authorize the

24

UAW to bargain on their behalf in all future negotiations, as Caterpillar suggests. If the court accepted Caterpillar's interpretation of the CLS Agreement, the CLS subclass retired without knowing what their retirement benefits would ultimately be. Elliot Anderson, the chief negotiator for the UAW on the CLS Agreement, testified that if he had negotiated such a scheme, he would be "fired retroactive." (Tr. 37). Caterpillar's reading would also contradict the assurances given to the UAW before voting to ratify the CLS Agreement. Prior to ratification, Caterpillar assured the UAW that CLS workers would not lose "any seniority related or other contractual rights" and that their health care provisions would remain the same.

To accept Caterpillar's reading would also mean that the CLS subclass, who would never be able to vote for or against the retirement benefits themselves, agreed to let active employees negotiate their retirement benefits. Such consent would be remarkable because the two groups–active workers and retirees–are in conflict. There is no evidence that such consent was requested or given here. As the Sixth Circuit noted in *Yard-Man,* 716 F.2d at 1482, because "benefits for retirees are only permissive not mandatory subjects of collective bargaining . . . it is unlikely that such benefits, which are typically understood as a form of delayed compensation or reward for past services, would be left to the contingencies of future negotiations." *See also Yolton v. El Paso Tenn. Pipeline Co.*, 2008 WL 2566860, at *10 (E.D. Mich. Mar. 7, 2008)("There is no evidence that [retired] Plaintiffs granted the UAW authority during its negotiations with Case to relieve Case of its contractual obligations to pay the costs of Plaintiffs' vested health care benefits.").

25

**Extrinsic Evidence**

Having determined that the CLS Agreement is clear and unambiguous, the court need not resort to extrinsic evidence. However, the extrinsic evidence of the parties' intent and interpretation of the CLS Agreement adduced at the evidentiary hearing supports the court's reading of the CLS Agreement.

Anderson and Atwood both testified that the definition of "Covered Employee" did not include retirees. The UAW explained in correspondence to its members, prior to their ratification vote regarding the CLS Agreement, that "there would be no changes in wages, pensions, health care and all other economic provisions, and no changes in non-economic provisions." Anderson likewise testified that "what we negotiated in the CLSA did not reduce any benefits" and "the next agreement would not apply to retirees." Broadbear testified that, although during the CLS Agreement negotiations the UAW and Caterpillar did not discuss whether the agreement would apply to retirees, he believed the CLS Agreement was "a win-win" for the company and the union, in part because employees could enter the agreement "without employees losing any seniority related or contractual rights."

During the course of 1998 labor contract negotiations, Caterpillar explicitly acknowledged that CLS employees who retired prior to the signing of the next contract were no longer represented by the UAW and not bound by any new contract. In a letter dated May 11, 1993, Caterpillar's Director of Corporate Labor Relations wrote to the UAW concerning Morton and Memphis employees who had worked under the CLS agreement and retired prior to October 1, 1988: "As far as Caterpillar is concerned, the UAW does not legally represent individuals

26

once they have retired. <u>See Allied Chemical and Alkali Workers v. Pittsburgh Plate Glass Co., 404 U.S. 157 (1971).</u>"  (Docket No. 202, Ex. 7)(emphasis in original).

When the 1998 CLA was ratified, Brust did not take the position that the new agreement was automatically applicable to CLS retirees.   Instead, he  and his UAW counterpart, Atwood, corresponded concerning whether and when provisions of the new CLA would apply to the CLS subclass.

Considering the CLS Agreement as a whole, and the context in which it was negotiated, drafted, and ratified, the court finds that the CLS Agreement dictated that the 1988 CLA and corresponding GIP was the source of all benefits for those working under the extended CLA, including retirement benefits.  Caterpillar received the benefit of the CLS subclass' continued work during the strike.  In exchange, the CLS subclass continued to enjoy the benefits of working under a labor contract, including the right to retire and obtain retirement benefits set forth in the 1988 CLA, IPA, and GIP.  Extrinsic evidence shows that Caterpillar gave the CLS retirees benefits under the 1988 CLA during the labor dispute.  This course of conduct conflicts with Caterpillar's contention that the CLS retirees were subject to the unilaterally implemented terms and conditions of employment.

**2.     The 1988 GIP provided for a vested right to lifetime retiree health benefits.**

Having determined that the CLS Agreement extended the 1988 labor contract beyond its expiration for the CLS subclass such that they retired under that contract, the court must now consider whether the retiree benefits sought in this case are vested.

27

Caterpillar argues that plaintiffs have constantly redefined what benefits they seek and consider vested. According to the defendant, "this type of subjective, evolving claim improperly gives litigants seeking vested benefits unfettered ability to decide, on an ever-changing basis, what benefits they want to claim as vested." (Docket No. 303 at 15 n.11). The plaintiffs, however, seek the same relief now as they sought in their Motion for Preliminary Injunction. On behalf of the CLS subclass, they seek an order enjoining Caterpillar from continuing to charge premiums to maintain their health insurance and enjoining Caterpillar from making changes to the CLS subclass that are inconsistent with the benefits currently provided to other Caterpillar retirees who retired prior to 1992. It was not until the evidentiary hearing, however, that the particulars of the plaintiffs' requested relief became clear.

The statements of counsel and the evidence submitted by both parties at the hearing clarified that pre-1992 retirees currently enjoy premium-free retiree health care under one of two 1998 Summary Plan Descriptions. (Tr. 542, 547 Stevens; Pls.' Exs. 59, 60, 135 at 77-78). Further, "no cost" retiree health care is a misnomer; there are *some* costs borne by the pre-1992 retirees, and the plaintiffs do not seek relief from bearing those costs. (Tr. 549 Stevens; *see also* Docket No. 300 at 16). There is no longer a 1988 retiree health care plan in existence; therefore, pre-1992 retirees are covered under one of two 1998 SPDs. (Tr. 542, 547 Stevens; Pls.' Exs. 59, 60, 135 at 77-78). One plan, the "Caterpillar Hourly Retirees Central Agreement Covered under Indemnity Benefit Plan," is for employees who retired at age 65 or over, prior to July 1, 1992. (Pls.' Ex. 59 at C025387). These employees are "indemnity" employees and are not subject to the Network. (*Id.* at C025383-86). However, effective January 1, 2000, if they retired on or after January 1, 1992, they began paying a premium for health care coverage. (*Id.* at C025392)

28

The other plan, "Caterpillar Hourly Retirees Central Agreement Covered under the NetWork," is for employees who retired under age 65 on or after July 1, 1992. (Pls.' Ex. 60 at P01132). These persons are subject to the Network. (*Id.* at P01127-28).

The plaintiffs do not differentiate between the two 1998 SPDs in their briefs. The court presumes the plaintiffs seek the benefits provided by the second plan, for non-indemnity employees, because the benefits of that plan are consistent with the plaintiffs' requests and expressed willingness to be subject to the Network.

The court applies general principles of contract law to determine whether the retiree benefits sought in this case are vested. *Yard-Man*, 716 F.2d at 1479-80. *Yard-Man* recognized that parties to CBAs can agree to vest benefits that survive the termination of the agreement. *Id.* at 1479. Whether the benefits vest depends upon the intent of the parties. *Golden,* 73 F.3d at 654. "Courts can find that rights have vested under a CBA even if the intent to vest has not been explicitly set out in the agreement." *Maurer v. Joy Techns., Inc.,* 212 F.3d 907, 915 (6th Cir. 2000). In *Golden,* the Sixth Circuit clarified that, in determining the intent of the parties to a CBA, "basic rules of contract interpretation apply." 73 F.3d at 654. The court set forth those rules previously herein. (*See* page 20). In making the vesting determination, courts may also consider the parties' "practice, usage and custom." *Consol. Ry. Corp. v. Ry. Labor Executives' Ass'n*, 491 U.S. 299, 311 (1989).

### a.    Express Contractual Language

The governing CBA contains no provisions related to health benefits. The source of the CLS subclass members' rights are in the 1988 GIP, which provides the retiree health care

29

benefits for retirees once they achieved pension eligibility.   The relevant language of the 1988

GIP is as follows:

> 5.15   Retiree Medical Insurance.  Retired Employees who satisfy the requirements hereinafter set forth shall be entitled to the same benefits provided in this Section V as if they were Employees. Coverage in accordance with this paragraph 5.15 shall be provided without cost to any such retired Employee if he has at least 5 years of credited service under the Non-Contributory Pension Plan at his retirement and is eligible for the immediate commencement of a monthly pension under the Non-Contributory Pension Plan or would be eligible for such immediate commencement but for his election to defer commencement of the pension.  Coverage shall take effect on his retirement date.

(Pls.' Ex. 16 ¶ 5.15).   This explicit language provides that retiree medical insurance coverage

"shall be provided" to eligible retirees "without cost."

**Tying retirement benefits to pension benefits**

Ruling on Caterpillar's Motion to Dismiss, the court previously held that the 1988 benefit

plan contains strong evidence of vesting because it links retiree medical benefits to pension

eligibility, which the Sixth Circuit has held constitutes strong evidence of vesting.  (Docket No.

120 at 22-23).   Caterpillar argues that the court placed too much reliance on the connection

between vesting of the retiree health care benefit and pension eligibility.  (Docket No. 240 at 21).

Yet, in *Noe v. PolyOne Corp*., 520 F.3d 548 (6th Cir. 2008), a case decided after this court's

ruling, the Sixth Circuit overturned a sister court for ignoring the connection between pension

eligibility and eligibility for retiree medical care.  *Id*. at 564.  "According to this court," the Sixth

Circuit said plainly, "language in an agreement that ties eligibility for retiree health benefits to

eligibility for a pension indicates an intent to vest the health benefits."  520 F.3d at 558.

Applying the same reasoning in *Yolton*, a 2006 case, the Sixth Circuit affirmed the district court's finding that the plaintiffs' benefits had vested, explaining that

> . . . the district court interpreted the language of the agreement and found evidence that the defendants intended to confer lifetime benefits upon the plaintiffs. Of particular significance to the district court was language in the Group Insurance Plan that tied benefits to the pension plans . . . . Because the pension plan is a lifetime plan and the health insurance benefits are tied to the pension plan, the district court found that the health insurance benefits were vested and intended to be lifetime benefits.

435 F.3d at 580.

In *Golden*, similar language in each of the CBAs tied retiree benefits and surviving spouse eligibility for health insurance coverage to eligibility for vested pension benefits. 73 F.3d 648. The Sixth Circuit affirmed the district court's finding that, "[s]ince retirees are eligible to receive pension benefits for life," tying retiree health benefits to pension eligibility indicates "that the parties intended that the company provide lifetime health benefits as well." *Id.* at 656. Similarly, in *McCoy*, 390 F.3d 417, the Sixth Circuit affirmed the district court's finding that the retiree plaintiffs had established a likelihood of success on the merits of their claim. *Id.* at 426. After finding that the collective bargaining agreement in that case incorporated a supplemental agreement, the Court held, "Because the Supplemental Agreement ties eligibility for retirement-health benefits to eligibility for a pension, in other words, there is little room for debate that the retirees' health benefits vested upon retirement under *Golden* . . . ." *Id.* at 422*; see Cole v. ArvinMeritor, Inc.*, 515 F. Supp.2d 791, 800 (E.D. Mich. 2006)(because, *inter alia*, the governing contract ties retiree health benefits to pension status, it "constitutes an enforceable contractual promise of lifetime retiree health benefits to accompany lifetime pension benefits.").

31

Likewise, in this case, the language of Paragraph 5.15 of the 1988 GIP unambiguously ties retiree health benefits to pension eligibility. This language closely resembles that which other courts have found vests benefits. Under the controlling law, such language constitutes strong evidence of an intent to vest.

**General or specific durational clauses**

"The Sixth Circuit has held that a durational clause in an Agreement separate from any language or reference to a specific type of benefits is a general clause, applicable only to the Agreement's duration and not the benefits' life." *Cates v. Cooper Tire & Rubber Co.*, 555 F. Supp.2d 878, 887 (N.D. Ohio 2008)(citing *Maurer*, 212 F.3d at 917-18).

Here, the 1988 IPA, like the CBA, was effective by its terms until October 1, 1991. Neither the IPA nor the GIP contained durational language linking the end of the offer of the retirement plan to the end of the CBA. As in *Maurer*, "Even though the clause makes clear that the insurance agreement terminates after three years, case law indicates that the termination of the agreement does not indicate the termination of benefits it created, if the parties intended benefits to vest." 212 F.3d at 917-18. In fact, here the IPA expressly stated: "Termination of this Agreement shall not have the effect of automatically terminating the Plan." "The Plan" refers to the GIP. Therefore, the court finds that this provision is a general durational clause and is not indicative of intent that benefits not vest.

**The presence of specific durational clauses in other sections of the agreement**

The presence of specific durational language in other provisions of the benefit plan and the absence of such language in the retiree health benefit provisions suggests intent to vest. *Noe*,

520 F.3d at 562-63 (citing *Yard-Man*, 716 F.2d 1476, 1481-82)). *Noe* contained several specific durational provisions: three months of coverage in the event of a layoff, twenty-four months of coverage in the event of a plant closing, and three months for a leave of absence. *Id.*

The Caterpillar GIP contains similar provisions. For example, a terminated employee's health insurance coverage ends on the last day of the calendar month in which the employee ceases to be actively at work. An employee on a leave of absence will have continued coverage for a period of 12 months. (Pls.' Ex. 15, Section 6(a)(i) & (ii)). "The inclusion of such specific durational language 'in other provisions of the current collective bargaining agreement suggests that retiree benefits, not so specifically limited, were intended to survive the expiration of successive agreements.'" *Noe*, 520 F.3d at 563 (quoting *Yard-Man*, 716 F.2d at 1481-82; *see also Yolton*, 435 F.3d at 582 (finding that specific durational provisions for laid-off employees and those on maternity leave was evidence that retiree benefits vested under *Yard-Man*). Indeed, the retiree health care benefit durational language in this case suggests a lifetime benefit: "such coverage on account of an Employee who retires may be continued pursuant to paragraph . . . . 5.15." (Section 6(a)(iv)).

**The effect of an interpretation on other clauses in the agreement**

The Sixth Circuit has cautioned against rendering portions of employee benefit agreements illusory. *See, e.g., Yard-Man*, 716 F.2d at 1481 ("If retiree insurance benefits were terminated at the end of the collective bargaining agreement's three-year term, this promise is completely illusory for many early retirees under age 62.").

In this case, Paragraph 5.15 provides that Dependent's Coverage will be "continued following the death of a retired Employee for the remainder of his surviving spouse's life

33

without cost." (Plf.s' Ex. 16, 1988 GIP). The surviving spouse's benefit could not "continue" if benefits stopped during the life of the retiree. *See BRV Liquidating, Inc*., 190 F.3d 768, 773 (6th Cir. 1999)(finding lifetime benefits: "Indeed, to what other date other than the death of the retiree of the spouse could the word 'continue' apply?"); *see also Helwig*, 93 F.3d 243, 248 (6th Cir. 1996)(finding that "[w]hen you are retired, your Health Care coverages, except for vision, are continued without cost to you" demonstrated an intent to vest benefits); *Smith v. ABS Indus. Inc.*, 890 F.2d 841, 846 (6th Cir. 1989)("[b]enefits will continue for retirees" supports a finding of vesting); *UAW v. Loral Corp*., 873 F. Supp. 57, 64 (N.D. Ohio 1994), *aff'd*, 107 F.3d 11 (6th Cir. 1997)("If the retiree had not been expected to receive benefits *until his or her death*, what benefits would have existed for the surviving spouses 'to continue to receive'?")(emphasis in original).

The contractual language "continue" for the surviving spouse, which logically requires that the benefit was initially available for the retiree, and the link between the retiree benefit and that of the surviving spouse are additional evidence that the parties intended benefits to vest for life.

**Reservation of rights clause**

Caterpillar has claimed that the 1988 SPD contains language amounting to a reservation of rights. (Docket No. 75 at 17). The court previously rejected this argument when denying Caterpillar's Motion to Dismiss. (Docket No. 120 at 27).

A reservation-of-rights clause cannot be used to cancel contractually vested rights. The Sixth Circuit has held that the general reservation of rights language cited by Caterpillar is insufficient to dispel an inference of vesting. When the reservation language is qualified by

34

reference to the applicable collective bargaining agreements, as it is here, the reservation does not excuse the company from its contractual obligations. *See Yolton*, 435 F.3d 571, 582 (rejecting the defendant's argument that reservation of right in SPD permitted the modification of retirement benefits in finding that the "right to modify the Group Insurance Plans is expressly limited to the terms of the [CBAs]. Because the district court found that the CBA creates the vested lifetime benefits, the court further concluded that this language does not reserve to the defendants the right to modify those benefits."); *McCoy*, 390 F.3d 417, 424 (finding that the SPDs upon which defendant relies do not "establish a termination right without reference to the collective bargaining agreement and the limitations on that right included in the agreement." *Cf Maurer,* 212 F.3d 907 (6th Cir. 2000)(finding the reservation effective where the reservation was not generic (like Caterpillar's), but specific, and where the booklet did not contain a provision (which is in the Caterpillar booklet) that the negotiated contracts control).

In *Prater v. Ohio Educ. Ass'n*, 505 F.3d 437 (6th Cir. 2007), the Sixth Circuit reaffirmed its reasoning in *Yard-Man, McCoy*, and *Maurer* in the context of reservation of rights language. *Id*. at 444. ("But we stand by this clarification of *Maurer* because a broad reading of the decision would run headlong into the rule that a plan summary 'cannot vitiate contractually vested or *bargained-for* rights.'")(emphasis in original). There is no new evidence before the court warranting a reversal of the court's prior ruling on this matter. The court stands by its earlier ruling for the reasons previously expressed and reaffirmed by the Sixth Circuit in *Prater*. The fact that the 1988 SPD contains no effective reservation of rights further suggests that the parties intended that benefits vest. *Cf. Musto v. Am. Gen. Corp*., 861 F.2d 897, 906 (6th Cir.

35

1988)(finding that the parties did not intend benefits to vest where the Agreement included an explicit clause allowing the employer to amend the benefits plan).

### b. The Yard-Man inference

The Sixth Circuit has recognized that the context in which CBAs are negotiated merits an additional inference that the parties intended benefits to vest. Retiree benefits are, in a sense, "status" benefits that carry an inference that they continue as long as the requisite status is maintained. *Yard-Man*, 716 F.2d at 1482-83 ("[T]he very fact that the benefits at issue belong to retirees creates an inference (but not a presumption) that such benefits are 'intended . . . to continue as long as the beneficiary remains a retiree.'"). "Retirement benefits are typically understood as a form of delayed compensation for present services, for which workers forego present wages." *Terrell v. Dura Mech. Components, Inc.*, 934 F. Supp. 874, 881 (N.D. Ohio 1996)(citing *Allied Chem. Workers v. Pittsburgh Plate Glass Co.*, 404 U.S. 157, 180)). "This contextual factor," according to the Sixth Circuit, can buttress "the already sufficient evidence of such intent in the language of the agreement itself." *Golden*, 954 F. Supp. at 1184 (citing *Yard-Man*, 716 F.2d at 1482).

Although the *Yard-Man* decision has generated controversy and its viability has been challenged, *Yard-Man* remains good law. *See Yolton*, 435 F.3d at 579-80 ("There is no need to revise, reconsider, or overrule *Yard-Man*."); *Golden*, 73 F.3d at 656 ("After considering the arguments the defendant makes, and the cases it cites, we conclude that *Yard-Man* is still good law, and controls this case.") The Sixth Circuit noted in *Yolton* that the *Yard-Man* inference "makes the most sense" where retirees who retired under a previous benefit plan are challenging changes the employer made to the plan after they retired. 435 F.3d 571, 581 n.6. Such is the

36

exact case here. "Retirees, who have left their bargaining unit, and can no longer rely on their union to maintain their benefits, are not likely to leave their benefits alterable based on the changing whims and relative bargaining power of their former union and employer." *Id.*

The court finds that the *Yard-Man* inference applies in this case, as it buttresses the other evidence of vesting in the Agreement itself. *See Golden*, 954 F. Supp. at 1184 (citing *Yard-Man,* 716 F.2d at 1482). That Caterpillar only modified the retiree health care benefits package instead of eliminating retiree health care altogether does not render the *Yard-Man* inference inapplicable in this case. The Sixth Circuit has affirmed, in an unpublished decision, that *Yard-Man* is not only appropriate where the employer terminates benefits, but also where an employer places additional limitations on previously vested benefits. *See Loral*, 107, F.3d 11, 1997 WL 49077, at *1 (6th Cir. Feb. 3, 1997)("This argument cannot be reconciled with our prior case law, which has applied *Yard-Man* in situations where the benefits scheme has been modified by the employer, but not eliminated entirely.")

To summarize, in interpreting the explicit language of the relevant documents, the court finds evidence that Caterpillar intended to confer lifetime vested retiree medical benefits upon the plaintiffs.

### c. Extrinsic Evidence of Vesting

Next, even if the language of the GIP were ambiguous, there is also extrinsic evidence that indicates the parties intended the benefits to vest.

**Brust's testimony**

The testimony of Caterpillar's then Director of Corporate Labor Relations supports vesting. In describing why Caterpillar announced potential changes in 1991, Brust claimed that "we wanted to give employees an opportunity – if they were contemplating retiring in the near future . . . to make the decision whether they were going to in effect, cash in their chips and push them back from the table prior to January of '92 and retire knowing that they had locked in at that point." (Tr. 373). Brust's use of the phrase "locked in" suggests that Caterpillar knew these benefits could not be taken away.

Of course, despite Brust's testimony, Caterpillar in December 1992 made its implemented changes retroactive *by eleven months* to January 1, 1992, making it impossible for employees to "cash in their chips" and "lock[] in" their retirement benefits. (*See* Pls.' Motion for Class Certification, Docket No. 103 designating subclass of employees who were retroactively incorporated into Caterpillar's implemented retirement plan).

**Bargaining history**

The parties' bargaining history shows that the CLS subclass had vested retiree benefits and retiree benefits could be improved in subsequent agreements.

Retirement benefits first became available in 1964. Although the UAW did not have authority to renegotiate vested benefits, it could and did negotiate increases to the pension and medical benefits offered to current retirees. For example, in 1988, the UAW and Caterpillar negotiated improvements in durable medical equipment, dental care, prescription drugs, speech therapy, and the amount of the Medicare B co-pay.

38

Caterpillar makes much of the fact that, in 1983, the UAW negotiated a reduction to the retiree health care benefit. According to Caterpillar, the fact that the UAW could negotiate reductions to retiree health care benefits demonstrates that the benefits were not vested. Gene Broadbear, who was in charge of negotiating on behalf of the UAW at the time, testified that the co-pay for prescription drugs was increased by less than $5 and was a relatively minor "modification"– not reduction – to the existing retiree health care package. UAW's Atwood explained that, while viewed in isolation the increase in co-pay appeared to be a reduction in retiree health care benefits, the package of benefits available to retirees was improved, offsetting the minimal increase in drug co-pays.

In any event, the plaintiffs' "toleration of previous changes to their health insurance benefits that were negotiated by the UAW does not bar them from claiming that those benefits are vested." *Reese v. CNH Global N.V.*, 2007 WL 2484989, at *6 (E.D. Mich. Aug. 29, 2007)(citations omitted); *see Hinckley v. Kelsey-Hayes Co.*, 866 F. Supp. 1034, 1042 (E.D. Mich. 1994)("[M]erely because plaintiffs chose not to bring suit on earlier changes does not mean that they have tacitly admitted that their benefits are limited and terminable. Instead, it merely indicates that the substance of the more recent changes have prompted them to seek relief."); *Helwig*, 857 F. Supp. 1168, 1174 n.2 (E.D. Mich. 1994)(tolerating earlier changes, like unilaterally increased prescription co-payments, does not bar suit on later changes); *Schalk v. Teledyne, Inc*., 751 F. Supp. 1261, 1266-67 (W.D. Mich. 1990)(tolerating earlier changes, like collectively-bargained increased prescription co-payments "that no one objected to," does not bar suit on later changes), *aff'd,* 948 F.2d 1290, 1291 (6th Cir. 1991).

39

In *Cole v. Arvinmeritor, Inc.*, 516 F. Supp.2d 850 (E.D. Mich. 2005), the defendants alleged that they made changes over a period of years and intended to make additional benefit changes in the future. They argued that this showed their unilateral authority over the duration of retiree health benefits. The court found their argument "unpersuasive." *Id.* at 873. Specifically pointing to a 1991 change that altered the mechanism for buying drugs, the court noted, "the change did not diminish benefits," actually "resulted in savings for retirees, and in any event was de minimus." *Id.* The court noted that some of the other changes touted by defendants – including increased prescription drug co-pays – were agreed to by the UAW. "There [wa]s no history," said the court, "of unilateral material changes. Even if there were, it would be of no consequence." *Id.* Likewise, the court finds that, on the facts presented, the UAW-negotiated $5 increase in prescription drug co-pays for retirees was *de minimus* and did not strip retirees of their vested rights.

**Course of Conduct**

The UAW protected the CLS subclass' vested benefits during the labor dispute. When the labor conflict took effect in 1992, the extension of the 1988 contract prevented the CLS workers from being subject to Caterpillar's implemented terms. CLS workers enjoyed benefits from the 1988 CLA, which had been bargained for by the UAW and remained in "full force and effect." Their pay, their medical benefits, their working conditions, and their retirement package all came from the 1988 contract.

During the labor conflict, the UAW rejected Caterpillar's repeated offers to give the CLS subclass benefits under implemented terms, which included a pension increase to $1800 per month, rather than under the 1988 agreement, which only provided $1600 per month. The UAW

40

rejected Caterpillar's offer because the company was insisting that the pension increase was contingent on acceptance of the proposed health care cap and other terms that the union opposed at the bargaining table. After the UAW's rejection, Caterpillar confirmed that CLS employees and retirees were under the 1988 CLA when Caterpillar specifically explained that the unilaterally implemented terms "do not apply to you." This extrinsic evidence shows that during the strike, under the CLS Agreement, the 1988 benefits plan "continue[d] in full force and effect" for the CLS subclass.

Further, despite Caterpillar's claims to the contrary, it is relevant that Caterpillar does not currently charge premiums to non-CLS retirees who retired under the 1988 CLA. (*See* Docket No. 254, Mulder Decl., Ex. 19 at C052067-052608). In *Steelworkers v. Connors Steel Co.*, 1987 U.S. Dist. LEXIS 14435, at *3 (N.D. Ala. 1987), *aff'd*, 855 F.2d 1499 (11th Cir. 1988), the court considered an analogous situation where the company continued benefits. The Court explained: "It is difficult to explain such sizable expenditures by a non-eleemosynary, stockholder-owned institution without there being a sense of legal obligation to make those expenditures. Moral obligations are rarely recognized in the corporate world, and for good reasons, stockholders' derivative suits being one. The payments may be explained by the language of the plans themselves . . . ." *Id.* at *3. *See also UAW v. Cadillac Malleable Iron Co.*, 1982 WL 20483 (W.D. Mich. Apr. 28, 1982), *aff'd,* 728 F.2d 807 (6th Cir. 1984) (rejecting company testimony that "this was done as an accommodation, and not because of a contractual obligation"). The fact that Caterpillar has continued health benefits for other retirees who retired under the 1988 Agreement is extrinsic evidence that Caterpillar believed their benefits vested under that Agreement.

The court finds that the first preliminary injunction factor weighs strongly in the favor of the CLS subclass. The subclass is likely to prevail on the merits of its claim because subclass members have a vested contractual right to retiree health care benefits based on the CLS Agreement's extension of the 1988 CLA.

**B.      Whether the Plaintiffs Will Suffer Irreparable Harm Without the Injunction**

The plaintiffs contend that the CLS subclass members are stretched to the edge of their emotional and financial resources. Absent an injunction barring Caterpillar's increasing charges, the plaintiffs state that they will be irreparably harmed. The plaintiffs present affidavits and testimony from four individuals, all of whom are living on modest, fixed incomes. These retirees and surviving spouses state that they lack the funds to contribute the monthly amount now required to retain their health care coverage. They suffer serious health problems and are required to take a number of expensive prescription drugs.

The individuals have limited their visits to their doctors and have been unable to undergo treatment. For example, Walter Shawgo has avoided dental surgery because of the cost, even though his teeth are infected and spreading the infection through his blood. (Tr. 206-07). He has also avoided, because of the cost, a colonoscopy recommended by his physician because of a history of colon cancer in his family. (Tr. 207). Judith Hunter, a former nurse, has numerous medical conditions including diabetes, hypertension, high cholesterol, a colluded artery, sleep apnea, myasthenia gravis, and hearing problems because of which she is in current pain. (Tr. 224-229). However, she has not gone to the doctor this year because of the cost; she does not want unpaid medical bills to accumulate. (Tr. 234). William Dailey has a kidney stone and is avoiding treatment. (Tr. 268).

Albert Church has delayed surgery on his legs for so long that his only choice now is amputation. His reason for avoiding the surgery: "I made a promise to my wife that I wasn't going to leave her in debt. She don't need my medical bills. So I wouldn't do it." (Tr. 252-53). He testified that, if the Caterpillar insurance had paid for the operation, he "most definitely" would have gotten it. (Tr. 253). Even after a heart attack in April of this year, Church initially refused to go to the hospital because of the cost and only complied when his son, a police officer, called an ambulance. (Tr. 254). He is now avoiding the amputation surgery, despite continued pain in his legs, because of the cost. (Tr. 254).

Others in this subclass state that they have stopped taking some of their prescribed medications or altered the way in which they take them in an effort to manage their increasingly unmanageable medical costs. For example, Hunter has begun taking only half of her blood pressure medicine to save money. (Tr. 234).

The premium charges are causing these individuals financial anxiety during retirement. Shawgo has been unable to pay his bills for the first time in his life and has turned to a church charity program for food. (Tr. 211). He and his wife are anxious about the calls from collection agencies trying to collect on medical bills. (Tr. 211-12). He has considered selling his home, but acknowledges that the money would only last three or four years. (Tr. 212). Shawgo is only 66 years old. (Tr. 202). Asked how he feels about accepting charity, he said, "I feel terrible having to do it . . . . It takes away part of being a man." (Tr. 212). Church also finds his financial condition "very depressing" and knows that his wife has "cried herself to sleep many a night." (Tr. 255). Hunter is also anxious about paying medical bills, and she has spent money

43

saved in her IRA on past medical bills, money she planned to use for her future care. (Tr. 231, 233).

The court finds that the testimony of Church, Shawgo, Hunter, and Dailey demonstrates irreparable harm from the financial hardship that they are suffering and will continue to suffer due to the changes in their retiree health care plans. *See Helwig*, 857 F. Supp. 1168, 1179 (E.D. Mich. 1994), *aff'd*, 93 F.3d 243 (6th Cir. 1996)(finding irreparable harm under similar circumstances because "retirees will be forced to choose between needed medical procedures and paying for basic necessities."); *Hinkley*, 866 F. Supp. 1034 (E.D. Mich. 1994)(finding irreparable harm because of the added costs associated with the changes made by the company to the health plan, as the retirees would be forced to forego needed medical treatment); *Schalk*, 751 F. Supp. 1261 (W.D. Mich. 1990), *aff'd*, 948 F.2d 1290 (6th Cir. 1991)(finding irreparable harm where the court recognized "the distinct possibility that retirees living on such limited means might choose to forego necessary medical treatment if they are required to pay co-pays and deductibles which are obviously well outside their means."); *see also United Steelworkers of Am. v. Texitron, Inc.*, 836 F.2d 6,6 (1st Cir. 1987)(Breyer, J.)(finding irreparable harm where "retired workers would likely suffer emotional distress, concern about potential financial disaster, and possibly deprivation of life's necessities."). "Retirees, primarily because of their fixed incomes, are unable to absorb even relatively small increases without extreme hardship." *Cole*, 516 F. Supp.2d at 877. The possibility of irreparable harm increases as the premiums, deductibles, and co-pays chip away at pensions and savings. *See Fox v. Massey-Ferguson*, 172 F.R.D. 655, 680 (E.D. Mich. 1995)("Due to the nature of the harm, the threat of injury is ever present.").

44

Caterpillar points out that its benefits are secondary to Medicare coverage for those retirees age 65 and older. (Def.'s Ex. 16 at 32; Pls.' Ex. 50 at 59). Although Medicare eligible retirees will have less need to utilize their Caterpillar coverage, and correspondingly less need to incur co-pays or deductibles associated with their secondary coverage, the court finds that, based on the current record, retirees and/or surviving spouses in the subclass– having already depleted their savings and foregone necessary medical treatment prior to the eligibility for Medicare coverage – could be financially and emotionally devastated absent the issuance of the requested injunction.

Caterpillar acknowledges that "[t]here is no question" that the individuals who testified "are facing difficult situations based on their own individual circumstances." (Docket No. 301 at 22). However, Caterpillar contends that the CLS subclass presented no evidence that the circumstances of these few individuals were representative of the entire class. For that reason, Caterpillar argues that the CLS subclass has not proven that they will suffer irreparable harm on a subclass-wide basis without an injunction.

To support its assertion, Caterpillar relies on a case from another circuit, *Adams v. Freedom Forge Corp*., 204 F.3d 475 (3d. Cir. 2000), in which the Third Circuit vacated a preliminary injunction as to "all non-testifying plaintiffs," who had not demonstrated a "specific and personal risk of irreparable harm." *Id*. at 491. But the Sixth Circuit has found irreparable harm where, although every member of the class did not testify, "plaintiffs submitted numerous affidavits from individual retirees detailing the impact of the modifications for the benefits plan to their finances." *Golden*, 73 F.3d 648. The *Golden* court also based its ruling on the opinions of other courts providing that reduction of benefits and imposition of additional insurance costs

45

on retirees constitutes irreparable harm because of the financial hardship on retirees with fixed incomes, emotional distress, and possible deprivation of life necessities by reallocating scant resources to pay for much needed health care. *Id.*

In *Yolton*, 318 F. Supp.2d at 472, *aff'd*, 435 F.3d 571 (6th Cir. 2006), the Sixth Circuit affirmed the district court's grant of a preliminary injunction. Specifically declining to adopt the reasoning of *Adams*, the Court noted that the plaintiffs in that case were required to contribute $501 per month to maintain any of their retiree health care benefits and then explained:

> While Plaintiffs only present the affidavits of the 34 retirees and surviving spouses, the Court can surmise that the putative class members overall cannot afford to contribute such an amount until this case is resolved. Unable to afford the $501 premium, Plaintiffs will lose their health care insurance, will not be able to pay for necessary prescription medications, and will not receive all of the medical care they need. Reimbursing Plaintiffs for their contributions at the end of the case, therefore, will not afford them relief.

*Id.*

Likewise, in *Bailey v. AK Steel Corp.*, 2006 WL 2727732 (S.D. Ohio Sept. 22, 2006), the district court, also rejecting the reasoning of *Adams*, found irreparable harm and issued a preliminary injunction in the plaintiffs' favor, relying on the declaration of ten out of 4500 potential class members. Id. at **9-10. The court explained: "These are just a few of the examples provided by way of the ten Declarations filed with the Court. Although the Court would have liked to have seen more declarations from retirees, based on the undisputed facts presented the Court can approximate what costs will be to each group of retirees (i.e., those over 65 and those under 65)." *Id.* at *10. The court went on to say, "[t]o require virtually all

46

members of a class of this size to present evidence of each member's harm would be an unreasonable burden to place on the Plaintiffs as well as on this Court." *Id.* at *10 n.9.

In this case, there are approximately 274 members of the CLS subclass. The plaintiff presented affidavit and live testimony of four individuals. Al Church's pension is $918.75 per month (Pls.' Ex. 100), Bill Dailey's pension is $943.37 per month (Pls.' Ex. 104), and Walter Shawgo's pension is $949.43 per month (Pls.' Ex. 116). As a surviving spouse, Judith Hunter receives a reduced pension of $514.39 (Pls.' Ex. 112). From these pensions, Caterpillar is deducting, each month, premium charges ranging between $250.69 per month (for a married retiree who is not on Medicare) to $115.38 per month (for a single surviving spouse who is on Medicare). (Pls.' Ex. 116). For retirees like Al Church, their pensions are reduced by 27% to $696.75 per month during retirement just to maintain their health insurance. After paying these charges, they still face deductibles and co-pays with a maximum of $750 for and individual and $1500 for a family every year.

The retirees themselves are 69 years old on average. (Docket No. 203, Romer Decl. ¶ 5). The surviving spouses of CLS retirees are, on average, 67 years old. (*Id.* ¶ 6). The retirees and their spouses are at ages that make it difficult to find work to supplement their pensions.

Based on these undisputed facts and others presented to the court, the court can surmise, as did the courts in *Yolton, Adams*, and *Helwig*, that the putative class members overall cannot afford to contribute such amounts until this case is resolved. The court finds that the plaintiffs have demonstrated class-wide irreparable harm.

47

### C. The Probability That Granting The Injunction Will Cause Substantial Harm to Others

The plaintiffs contend that the harm to class members outweighs any potential hardship to Caterpillar. The plaintiffs have demonstrated that, in large part due to Caterpillar's 2004 and 2006 modifications of and reductions in their retiree health care benefit packages, they are suffering from physical, emotional, and financial harm.

Caterpillar asserts that, "even if the CLS subclass is not required to bear the subject costs for retiree medical benefits, those costs that they avoid by issuance of any injunction will be born by other active or retiree populations." (Docket No. 301 at 22). However, Caterpillar provides no citation for this assertion. There is no evidence before the court that an injunction would cause substantial harm to others.

Caterpillar's public financial records show a first quarter profit in 2008 of $922 million. (Pls.' Ex. 83 at 2). Caterpillar has not argued, and the evidence does not suggest, that Caterpillar is at risk of insolvency. *See Bailey*, 2006 WL 2727732, at *11 (recognizing the problems that retirees and current employees would face if the defendant became insolvent, and issuing an injunction after finding "no evidence that [the defendant] was in such dire straits.") Until 2004, Caterpillar paid the entire premium and provided virtually cost-free retiree health care to the subclass members. In *Yolton*, 318 F. Supp.2d 455, the plaintiff retirees sought a preliminary injunction to prevent their former employers from raising their monthly premiums from zero to $290, and then to $501. In balancing the hardships, the court noted that the defendants had paid the full costs of its retirees' benefits for years, much like Caterpillar has here, and found that "the financial impact on Defendants being required to continue to pay these

48

benefits is far less than the financial burden which would be placed on Plaintiffs if their request for a preliminary injunction is denied." *Id*. at 473.

Similarly, the court finds that an injunction will have a relatively small impact on Caterpillar, given its financial security, and a tremendous positive impact on the class members, who are of limited means, lack negotiating power, and suffer from declining health. *See Golden*, 845 F. Supp. at 416 ("the harm to defendant of reinstating its former retiree health benefits would not outweigh the harm . . . caused to retirees forced to go without medical care or forced to choose between basic necessities in order to pay premiums and deductibles."); *see also Yolton*, 435 F.3d at 584 (affirming grant of preliminary injunction, noting the burden to defendants "is far less than the financial burden that would be placed on Plaintiffs if their request for a preliminary injunction is denied); *Wood v. Detriot Diesel Corp*., 2005 WL 3579169, at *7 (E.D. Mich. Dec. 30, 1995)(finding that plaintiffs faced greater hardship where co-payments would impact their "physical, emotional and financial well-being" and defendant claimed an unsupported "major adverse impact on its financial position"); *Bailey*, 2006 WL 2727731, at *11 (S.D. Ohio Sept. 22, 2006)(finding greater hardship on plaintiffs where defendant only claimed "significant competitive disadvantage" and made no claim of threat of insolvency). This is true, especially considering that Caterpillar is not being required to pay more than it previously paid but only to maintain the status quo during the pendency of this litigation. *See Bailey*, 2006 WL 2727732, at *11.

> **D.      Whether The Public Interest Is Advanced By The Issuance Of The Injunction**

The final consideration in granting a preliminary injunction is whether the injunction is in the public interest. Courts have held that enforcing benefits under ERISA and the LMRA are in

49

the public interest. *See Bailey*, 2006 WL 2727732, at *12 ("The public interest lies in protecting the legitimate expectations of retirees that their health insurance will be provided for the rest of their lives.")(quoting *Helwig*, 857 F. Supp. 1168, 1181). In *Golden*, the court found:

> ERISA provides that the policy behind it is to "protect the interests of participants in employee benefit plans . . . by establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans, . . . by providing for appropriate remedies, sanctions, and ready access to the Federal Court." 29 U.S.C. § 1001(b). In addition, the LMRA favors enforcement of collective bargaining agreements so as to protect the contractual rights of employees and employers.

*Golden*, 845 F. Supp. at 416. The court finds that the granting of a preliminary injunction is in the public interest.

## III.     CATERPILLAR'S AFFIRMATIVE DEFENSES

In a preliminary injunction hearing, the burden of proof is on the defendant when it raises an affirmative defense. *See Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 429 (2006); *Circuit City Stores, Inc. v. CarMax, Inc.,* 165 F.3d 1047, 1053 (6th Cir. 1999)(noting that district court had rejected defendants' affirmative defenses because defendants had not met their burden of proof in responding to plaintiff's request for preliminary injunction). Caterpillar has raised two affirmative defenses: statute of limitations and estoppel.

### A.     Statute of Limitations

There is no express statute of limitations that applies to Section 301 claims under the LMRA or to Section 502 claims under ERISA. *See Sterling China Co. v. Glass Molders, Pottery, Plastic, & Allied Workers, Local No. 24*, 357 F.3d 546, 552 (6th Cir. 2004)(Section 301 LMRA claims); *Meade v. Pension Appeals and Review Comm.*, 966 F.2d 190, 194 (6th Cir.

50

1992)(ERISA claims).  As a general rule, courts borrow the most analogous state statute of limitations when there is no federal limitations period expressly applicable to a federal cause of action.  *Champion Int'l Corp. v. United Paperworkers Int'l Union*, 779 F.2d 328, 331 (6th Cir. 1985)(quoting *DelCostello v. Int'l Bhd. of Teamsters*, 462 U.S. 151, 158-60 (1966)).  In the Sixth Circuit, "straight" Section 301 LMRA actions borrow their statute of limitations from the forum state, *Sterling China Co.*, 357 F.3d at 553, unless a party can demonstrate that the adoption of the forum state's limitation period will "substantially undermine federal labor policy

or cause the parties undue hardship," *Champion*, 779 F.2d at 334 (citing *Consol. Express, Inc.*, 602 F.2d at 507-08).

Here, the forum state is Tennessee.  In Tennessee, the most analogous statute of limitation is the six-year statute of limitation for breach of contract.  *Tenn. Code Ann.* § 28-3-109.  *See Haynes v. O'Connell*, 599 F. Supp. 59, 62 (E.D. Tenn. 1984)(in action for wrongful denial of pension benefits by retired employees, court applied Tennessee's six-year statute of limitations to plaintiffs' LMRA and ERISA claims); *see also Meade*, 966 F.2d at 194-95 (the most analogous Ohio statute of limitation for an ERISA action for recovery of benefits to which the plan participant is entitled was fifteen-year limitation applicable to breach of contract claim).  The court has previously determined that Tennessee's six-year statute of limitations for breach of contract claims applies to the plaintiffs' LMRA and ERISA claims.  (Docket No. 120 at 36).

Although the statute of limitations is determined by state law, "federal law determines the date on which a statute of limitations begins to run."  *Mich. United Food & Comm. Workers Union & Drug Employees v. Muir Co.*, 992 F.2d 594, 598 (6th Cir. 1993).  "A claim under § 301 accrues when the claimant discovers, or in the exercise of reasonable diligence should have

51

discovered, the acts constituting the alleged violation. The determination of the accrual date is an objective one: the asserted actual knowledge of the plaintiffs is not determinative if they did not act as reasonable persons and, in effect, closed their eyes to evident and objective facts concerning the accrual of their right to sue." *Noble v. Chrysler Motors Corp.*, 32 F.3d 997, 1000 (6th Cir. 1994)(internal quotations and citations omitted).

In the ERISA context, "[a]lthough the statute of limitations may be borrowed from state law, it is federal law that determines the date on which a statute of limitations begins to run." *Michigan United Food and Commercial Workers Union and Drug*, 992 F.2d 594, 598 (6th Cir. 1993)(citations omitted). Thus, an ERISA claim accrues, and the limitations period begins to run, when the "plaintiff discovers, or with due diligence should have discovered, 'the injury that is the basis of this action.'" *Id.* at 597 (citations omitted); *see also United Steelworkers of Am., Local 2116 v. Cyclops Corp.*, 860 F.2d 189, 197 (6th Cir. 1988)(the statute of limitations begins to run when the company "fails to meet a pension obligation"). Recently, the Sixth Circuit further explained, in the ERISA context, that a cause of action accrues "when a fiduciary gives a claimant clear and equivocal repudiation of benefits that alone is adequate to commence accrual, regardless of whether the repudiation is formal or not." *Morrison v. Marsh & McLennan Cos., Inc.*, 439 F.3d 295, 302-03 (6th Cir. 2006).

In the application of the discovery rule to this case, the central question is when the plaintiffs should have become aware of Caterpillar's alleged breach of its contractual obligation to provide lifetime no-cost health benefits to retirees. The court also considers whether and at what point, if ever, Caterpillar unequivocally repudiated the plaintiffs' entitlement to lifetime no-

cost retiree health benefits.  The plaintiffs filed their Complaint on March 28, 2006; therefore, the action was timely only if it accrued after March 28, 2000.

### 1.    Certainty of Caterpillar's Retiree Medical Caps

In its opinion denying Caterpillar's Motion to Dismiss, the court reviewed some of the "notices" of proposed changes to premiums, co-pays, and deductibles and held:

> The court agrees with the plaintiffs that, because the wording of Caterpillar's communications regarding retiree benefits beginning in 1992 was so indefinite and contingent on future events, it could hardly have been clear to the plaintiffs that, years before the defendant actually began to make the challenged deductions, the plaintiffs had suffered an injury and that the statute of limitations on their claims had begun to run.  *See Edwards v. U.S. Dep't of Energy*, 200 Fed. Appx. 382, 386 (6th Cir.  2006)(applying "common sense" approach from a layperson's perspective to determination of accrual date).

(Docket No. 120 at 40).

The evidence adduced during the evidentiary hearing does not change, and, in fact, bolsters the court's prior ruling.  From 1992 until late 2004, retirees had every reason to believe that future negotiations between the UAW and Caterpillar would prevent Caterpillar from implementing the caps.   From the very beginning, Caterpillar described the caps as a possibility dependent and contingent on future events.  This indefinite and uncertain language continued until  October 10, 2004, when Caterpillar began deducting retiree health care premium charges from the CLS retirees' pensions.   As the court noted in the memorandum denying Caterpillar's Motion to Dismiss:   "Caterpillar made the decision in 2006 not to charge one group of retirees (surviving spouses) who received the same notice Caterpillar now claims repudiated its obligation to cover the costs of retiree health benefits, and Caterpillar contends that those

53

retirees' claims are moot." (Docket No. 120 at 40). If the plaintiffs had filed their claims while the caps were still being discussed as mere possibilities, they would have faced similar arguments. The court therefore concludes that it could not have been clear to the plaintiffs that, years before the defendant actually began to make the challenged deductions, the plaintiffs had suffered an injury due to Caterpillar's clear and unequivocal repudiation of benefits, thereby triggering the statute of limitations on their claims. The plaintiffs first knew of their injury in 2004, when Caterpillar first began deducting premiums from their pension payments. The plaintiffs filed their case on March 28, 2006, well within six years of the date of the claim accrual.

### 2. Network and other changes

New evidence adduced at the evidentiary hearing reveals that Caterpillar announced the forthcoming implementation of the Network in April 1998. Caterpillar contends that the announcement of, or, at the latest, the implementation of, the Network triggered accrual of the plaintiffs' claims. Because the plaintiffs filed this lawsuit in 2006-- more than six years after the imposition of the Network–Caterpillar contends they filed too late. The plaintiffs point out that they have not made a claim to enjoin the Caterpillar Health Care Network, and that, therefore, the accrual date for any claim about the Network is irrelevant.

When the Network was first proposed, Caterpillar described the Network as providing "full" coverage, repeatedly assuring employees that they would have no deductibles or co-payments. After the Network took effect, Caterpillar continued to inform retirees living within the Network service areas that covered medical expenses would be "payable in full" and "100%" for covered expenses at any network hospital or physician. Today, the pre-1992 retirees, who

Case 3:06-cv-00235   Document 306   Filed 09/16/08   Page 54 of 59 PageID #: 8835

are also subject to the network, are still eligible to receive full coverage anywhere in the country. (Tr. 553). UAW's bargaining representative Atwood testified that the imposition of the Network was actually an "improvement" for retirees.

In *Reese v. CNH Global*, 2007 WL 2484989 (E.D. Mich. Aug. 29, 2007), the defendant argued that the plaintiffs' benefits could not be vested because the defendant and the UAW had negotiated and agreed upon the imposition of a health care network plan on already retired individuals and their surviving spouses. Like the plaintiffs here, the *Reese* plaintiffs introduced testimony that the network was an improvement to retiree health insurance coverage. The court found that the plaintiffs' "toleration of previous changes to their health insurance benefits that were negotiated by the UAW does not bar them from claiming that those benefits are vested." *Id.* at *6; *see also Pabst Brewing Co. v. Corrao*, 161 F.3d 434, 442 (7th Cir. 1998))(noting that "an employer might be able to make minor changes in a retirees's health plan, perhaps even going so far as to impose a PPO or an HMO on retirees, without violating a promise to give lifetime benefits." Similarly, the court finds that, under the circumstances presented, that the plaintiffs may have accepted the rules of the Network did not put them on notice that Caterpillar was clearly and unequivocally repudiating their vested right to lifetime no-cost retiree health care.

In addition, the plaintiffs here maintain that the other changes to the retiree health care plan announced by Caterpillar in 1998 were minor and that they were not required to sue based upon those changes. In *Helwig*, 857 F. Supp. 1168, the defendant argued that the plaintiffs' action was barred by the statute of limitations because changes were made to the retiree benefits plan in 1984, 1985, and 1986, and the plaintiffs filed their claim approximately eight years later,

outside the governing statute of limitations. *Id.* at 1174 n.2. The district court rejected the defendant's affirmative defense, however, finding that the plaintiffs were not seeking to reverse the changes made in the mid-eighties; rather, they sought to reverse changes to the benefits plan enacted since January 1, 1992. *Id.* The court explained: "The changes made in the mid-eighties are not significant enough to bar plaintiffs' claim in this matter . . . . They did not impose any real costs upon retirees. The change that occurred in 1986, increasing the drug co-payment to $5.00 from $3.50, does not compare with the many, more significant changes that have occurred over the last two years. As a result, plaintiffs' failure to file suit to reverse the minor changes of 1986 does not bar them from challenging the more recent and far more significant changes instituted over the past two years." *Id.*

Similarly, in the instant case, prior to January 1, 2006, there was no annual deductible and no out-of-pocket maximum if the retiree used a network provider. Coverage was 100% for items covered under the plan. The prescription drug co-pay increase was less than $5 and was offset by other money-saving provisions in the plan related to prescription drug benefits. Essentially, "no cost" retiree health care to which the plaintiffs were entitled under the 1988 agreement was still available if the retiree stayed in Network. "Merely because plaintiffs cho[o]se not to bring suit on earlier changes does not mean that they have tacitly admitted that their benefits are limited and terminable. Instead, it merely indicates that the substance of more recent changes have prompted them to seek relief." *Hinkley*, 866 F. Supp. at 1042.

In summary, that plaintiffs may have accepted the rules of the Network and some other *de minimus* changes to their retiree health care package did not put them on notice that Caterpillar was clearly and unequivocally repudiating their vested right to lifetime no-cost retiree

56

health care.   The court finds that Caterpillar has not shown that the plaintiffs' Section 301

LMRA or ERISA claims are time-barred.

     **B.**     **Estoppel**

Caterpillar contends that the CLS subclass should be estopped from claiming vested

benefits because they accepted pension enhancements, lump sum payments and other increases

to their retiree medical benefits coverage under the 1998 and 2004 contracts.  (Docket No. 301 at

21).   The elements of estoppel in the Sixth Circuit are:

> (1) conduct or language amounting to a representation of fact; (2)
> the party to be estopped must be aware of the true facts; (3) the
> party to be estopped must intend that the representation be acted
> on such that the party asserting the estoppel has the right to believe
> it was so intended; (4) the party asserting the estoppel must be
> unaware of the true facts; and (5) the party asserting the estoppel
> must detrimentally and justifiably rely on the representation.

*Anderson v. Int'l Union, United Plant Guard Workers of Am.*, 370 F.3d 542, 555 (6th Cir. 2004);

*see Armistead v. Vernitron Corp.*, 944 F.2d 1287, 1298 (6th Cir. 1991)(explaining that this circuit

has incorporated the doctrine of equitable estoppel into the federal common law of contracts, at

least insofar as the agreement at issue is before the federal courts under the LMRA).

Caterpillar's estoppel argument ignores the historical fact that the UAW and Caterpillar

have negotiated increased benefits for many retiree groups, including for retirees who retired

prior to January 1, 1992.  These improvements to benefits are the result of common practices and

do not undermine the principle that vested benefits cannot be altered without the retirees'

consent.  *See Cadillac Malleable*, 1982 WL 20483 (W.D. Mich. April 28, 1982), *aff'd,* 728 F.2d

807 (6th Cir. 1984)(finding that there was "nothing inconsistent in granting vested retirement

Case 3:06-cv-00235   Document 306   Filed 09/16/08   Page 57 of 59 PageID #: 8838

benefits and then modifying those benefits through voluntary bargaining subject to approval by the already retired workers.").

Caterpillar has not offered any evidence that the retirees made any representation, intended to make a representation, or were "aware of the true facts" of any bargain. *See Anderson*, 370 F.3d at 555. Caterpillar did not state or imply that acceptance of pension increases or other benefits would in any way alter vested rights.

Given the parties' bargaining history, and that Caterpillar has offered no evidence that the plan participants intended to exchange lesser medical benefits for greater pension benefits, Caterpillar has failed to establish the necessary elements for estoppel

## IV.    ISSUANCE OF AN INJUNCTION WITHOUT A BOND

Pursuant to Rule 65(c), the court may issue a preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). The plaintiffs ask that the court issue the preliminary injunction without a bond. Caterpillar has not weighed in on this issue.

The court has discretion over whether to require a bond from the retiree plaintiffs and the amount of security required. *Cole*, 516 F. Supp.2d at 879 ("The 'rule in our circuit has long been that the district court possesses discretion over whether to require the posting of security.'") (quotation omitted). Courts have waived any bond in similar situations where retirees face financial constraints and have made a showing of likelihood of success. *See id.; Bailey*, 2006 WL 2727732, at *12 (issuing a preliminary injunction without bond under similar facts).

58

Considering all of the relevant circumstances of this case, including the age and financial means of the plaintiffs and that the plaintiffs have shown a strong likelihood of success on the merits, the court orders that the injunction issue without bond. *See Bailey*, 2006 WL 2727732, at *12 (issuing injunction without bond under similar facts); *Cole*, 516 F. Supp.2d 850, 879-80 (E.D. Mich. 2005)("Based on factors such as retirees' 'financial condition,' the 'likelihood of their success on the merits,' Defendant's 'admission of its obligation,' and the public interest, courts may grant preliminary injunctions requiring continuation of collectively-bargained health benefits with no bond or with a nominal bond.").

## V.     CONCLUSION

Having balanced the four factors that are to be weighed when determining whether a court should grant a preliminary injunction pursuant to Federal Rule of Civil Procedure 65(b), the court finds that the plaintiffs have satisfied the requirements.   For the reasons stated above, the plaintiffs' Motion for Preliminary Injunction (Docket No. 200) will be granted by separate order.

Entered this 16th day of September, 2008.

_____
ALETA A. TRAUGER
United States District Judge

59